# APPEAL NO. 14-3601

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT
_____

## FREDERIC FEZARD AND LISA FEZARD,
### Each Individually and On Behalf Of All Others Similarly Situated,

### Plaintiffs - Appellants

### v.

## UNITED CEREBRAL PALSY OF CENTRAL ARKANSAS, INC. d/b/a
## UNITED CEREBRAL PALSY OF ARKANSAS

### Defendant – Appellee
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

District Court Case No. 4:13-CV-206 JM
_____

## BRIEF OF APPELLEE, UNITED CEREBRAL PALSY OF
## CENTRAL ARKANSAS, INC.
_____

S. Brent Wakefield     AR BIN 99144
James D. Robertson     AR BIN 95181
Barber Law Firm PLLC
*Attorneys for Appellee*
400 West Capitol Avenue, Suite 2700
Little Rock, Arkansas 72201-3414
Telephone: (501) 372-6175
Facsimile: (501) 375-2802
brent.wakefield@barberlawfirm.com
jrobertson@barberlawfirm.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ..........................................................v

STATEMENT OF THE ISSUES ......................................................1

STATEMENT OF THE CASE .........................................................2

SUMMARY OF THE ARGUMENT ...................................................5

ARGUMENT ..............................................................................6

I.      District Court Properly Granted UCP's Summary Judgment
        Motion and Denied Appellants' Partial Summary Judgment
        Motion……….............................................................................6

        A.      Standard of Review ....................................................8

        B.      Applicable Law - Companionship Exemption ....................9

        C.      Individual Analysis of Clients' Living Quarters.................16

                1.      Deloma Bennett.................................................18

                2.      Sam Adams .......................................................19

                3.      Karen Hornback .................................................20

                4.      Willis Hornback .................................................20

                5.      Debra Joiner .....................................................22

                6.      Susanne Jones ...................................................23

                7.      Janeen Essary ....................................................24

                8.      Tiffany Ellis ......................................................25

                9.      Albertine Winston ..............................................26

                10-11. Lisa Fezard and Frederic Fezard – Class Representatives ......28

                        a. Client, CM.....................................................28

Appellate Case: 14-3601     Page: 2     Date Filed: 01/30/2015 Entry ID: 4239642

        b. Client, JL ......................................................................29

        c. Client, PH ......................................................................30

    12. Helen Buckley ....................................................................33

        a. Client, JL (Fred Fezard's Ward) ...........................33

        b. Client, CM ....................................................................34

        c. Client, PH ......................................................................35

    13. Appellants Generally ......................................................35

II.    District Court Properly Granted Summary Judgment on Lisa Fezard's
Retaliation Claim ........................................................................37

    A. Summary Judgment Standard; Bench Trial ............................37

    B. Retaliation ............................................................................38

    C. Lisa Fezard Did Not Engage in Statutorily Protected Activity Prior to
Termination and Could Not Prove a *Prima Facie* Case of
Discrimination ........................................................................40

      1.  Lisa Fezard's Alleged Workplace Complaints Not Protected
Activity ........................................................................40

      2.  Lisa Fezard Did Not Contact DOL Until After Her
Termination ..................................................................43

      3.  Legitimate, Non-Discriminatory Reasons for Termination – No
Pretext ........................................................................45

III.    Whether the District Court Abused Its Discretion by Sanctioning
Appellants for Discovery Violations ..............................................48

    A.    Whether Appellants Produced Required Evidence of Damages
Prior to Close of Discovery ....................................................56

    B.    Whether Appellants' Discovery Violations Met the Legal
Requirements for the Sanction Imposed ..................................61

Appellate Case: 14-3601    Page: 3    Date Filed: 01/30/2015 Entry ID: 4239642

  C.  Whether the District Court Abused its Discretion in Choosing the Sanction imposed ................................................................69

IV.  This Case Should Not be Reassigned If Remanded ....................................72

RULE 32 CERTIFICATE OF COMPLIANCE ...................................................74

CERTIFICATE OF SERVICE ...............................................................................75

Appellate Case: 14-3601  Page: 4  Date Filed: 01/30/2015 Entry ID: 4239642

# TABLE OF AUTHORITIES

## CASES:

*Agence France Presse v. Morel*, 293 F.R.D. 682 (S.D.N.Y. 2013) ................60, 72

*Ames v. Nationwide Mutual Ins. Co.*, 760 F.3d 763 (8th Cir. 2014) ........................32

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ..................................57

*Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357 (6th Cir. 2010) ........................................................................60, 72

*Brown v. L & P Industries,* LLC, No. 5:4CV0379 JLH, 2005 U.S. Dist. LEXIS 39920 (E.D. Ark. Dec. 21, 2005) .............................................1, 41

*City of Mt. Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268 (8th Cir. 1988) ........................................................................................36

*CQ, Inc. v. TXU Mining Co., L.P.,* 565 F.3d 268 (5th Cir. 2009) ...................60, 72

*Carmody v. Kansas City Bd. Of Police Comm.,* 713 F.3d 401 (2013) ..................71

*Dalheim v. KDFW-TV*, 918 F.2d 1220 (5th Cir. 1990) ....................................... 8, 9

*Dynegy Marketing and Trade v. Multiut Corp.,* 648 F.3d 506 (7th Cir. 2011) ........................................................................................60, 72

*Edgar v. Slaughter*, 548 F.2d 770 (8th Cir. 1977) ..................................................62

*ELCA Enterprises, Inc. v. Sisco Equip. Rental & Sales, Inc.*, 53 F.3d 186 (8th Cir. 1995) ......................................................................................59

*Everyday Learning Corp. v. Larson*, 242 F.3d 815 (8th Cir. 2001) ......................62

*Fatemi v. White*, 2015 U.S. App. LEXIS 89 (8th Cir. Ark. Jan. 6, 2015) ........................................................................................................15

*Fowler v. Incor*, 279 Fed. Appx. 590 2008 U.S. App. LEXIS 10213 (10th Cir. 2008) ..................................................................................8

v

*Gibson v. Geithner*, 2015 U.S. App. LEXIS 348 (8th Cir. 2015) ...........................39

*Gilmore v. Novastar Financial, Inc.*, 579 F.3d 878 (8th Cir. 2009)..................30, 35

*Gould Paper Corp. v. Madisen Corp.,* 614 F.Supp.2d 485 (S.D.N.Y. 2009) .......................................................................................60, 72

*Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667 (1st Cir. 1995) .....................32, 33

*Grey v. City of Oak Grove*, 396 F. 3d 1031 (8th Cir. 2005) ....................................39

*Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009) ...........................38

*Hoffman v. Construction Protective Services, Inc.,* 541 F.3d 1175 (9th Cir. 2008) .......................................................................................1, 60, 71, 72

*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (U.S. 1986) .........................8, 9

*Johnston v. Volunteers of America, Inc.,* 213 F.3d 559 (10th Cir. 2000)............. 1, 7

*Kasten v. Saint-Gobain Performance Plastics Corp.,* 131 S. Ct. 1325 (2011) ........................................................................................................40

*Keefer v. Provident Life and Accident Ins. Co.,* 238 F.3d 937 (8th Cir. 2000) .......................................................................................................62

*Laclede Gas Co. v. G.W. Warneckie Corp.,* 604 F.2d 561 (8th Cir. 1979) .......................................................................................................59

*Lambert v. Genesee Hosp.,* 10 F.3d 46 (2nd Cir. 1993) ...........................................41

*Liang v. Café Spice SB, Inc.*, 911 F. Supp. 2d 184 (E.D.N.Y. 2012) ....................41

*Liberles v. County of Cook*, 709 F.2d 1122 (7th Cir. 1983) ....................................33

*Linn v. Developmental Services of Tulsa, Inc.*, 891 F. Sup. 574 (N.D. Okla. 1995) .......................................................................................6, 14

vi

Appellate Case: 14-3601     Page: 6     Date Filed: 01/30/2015 Entry ID: 4239642

*McBurnie v. Prescott*, 511 Fed. Appx. 624, 2013 U.S. Dist. LEXIS 5004 (9th Cir. 2013) .......................................................................38

*Montgomery v. Havner*, 700 F.3d 1146 (8th Cir. Ark. 2012) .................................39

*Nunez v. Superior Oil Co.*, 572 F.2d.1119 (5 Cir. 1978)..................................38, 44

*In Re: Dennis J. O'Brien*, 351 F.3d 832 (8th Cir. 2003) .........................................62

*Olaya v. Wal-Mart Stores, Inc.,* 2012 U.S. Dist. Lexis 111079 (D. Nev. 2012) .......................................................................60, 72

*Pearson v. City of Big Lake*, 689 F. Supp.2d 1163 (D. Minn. Feb. 25, 2010) ........................................................................1, 39

*Pina v. Children's Place*, 740 F.3d 785 (1st Cir. Mass. 2014) ...............................44

*Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp* 986 F.2d 1208 (8th Cir. 1993) .................................................................31

*Ritchie v. St. Louis Jewish Light*, 630 F.3d 713 (8th Cir. 2011) .............1, 38, 41, 42

*Ritchie v. St. Louis Jewish Light*, No. 4:09-CV-1947 CAS, 2010 U.S. Dist. LEXIS 10579 (E.D. Mo. Feb. 8, 2010) ......................................41

*Sanders v. Elephant Butte Irrigation Dist. of N.M.*, 112 F.3d 468 (10th Cir. 1997).......................................................................8

*Schoffstall v. United States Postal Service*, 223 F.3d 818 (8th Cir. 2000) .......................................................................62

*Scott v. Harris*, 550 U.S. 372 (U.S. 2007) ...........................................................44

*Sentis Group, Inc. v. Shell Oil Company*, 559 F.3d 888 (8th Cir. 2009) ................72

*Solis v. FirstCall Staffing Solutions, Inc.*, 2009 U.S. Dist. LEXIS 107543 (W.D. Mo. 2009)............................................ 1, 6, 11, 12, 13, 14, 16, 34

*Son v. Reina Bijoux, Inc.*, 823 F. Supp. 2d 238 (S.D.N.Y. 2011) ..........................41

Appellate Case: 14-3601     Page: 7     Date Filed: 01/30/2015 Entry ID: 4239642

*Stevenson v. Union Pacific Railroad Co.,* 354 F.3d 739 (8th Cir. 2004) ...............62

*Terwilliger v. Home of Hope, Inc.*, 21 F. Supp. 2d 1294 (N.D. Okla. 1998) ...................... 1, 7, 9, 10, 11, 12

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. Minn. 2011) .................37

*University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013) .................................................................38

*Wallace v. DTG Operations, Inc.* 442 F.3d 1112 (8th Cir. 2006). .........................37

*Wegener v. Johnson*, 527 F.3d 687 (8th Cir. 2008) .................................................63

*Welding v. Bios Corp.,* 353 F.3d 1214 (10th Cir. 2004) ...............1, 8, 11, 12, 25, 28

*Williams v. Rich*, 2006 U.S. Dist. LEXIS 65251 (S.D. Ga. July 24, 2006) .................................................................45

## STATUTES:

Ark. Code Ann § 11-4-203 .....................................................................15

Ark. Code Ann. § 11-4-203(3)(O)(ii) ....................................................15

Ark. Code Ann. §§ 11-4-206, 218 (2013) .............................................69

28 U.S.C. §455 ......................................................................................73

29 U.S.C. §§ 201-219 ........................................................................... 8

29 U.S.C. § 213(a)(1) ............................................................................ 8

29 U.S.C. § 213(a)(15) ...................................................................... 9,10,14

## OTHER AUTHORITIES:

29 C.F.R. § 552.3 ..................................................................... 10, 11, 28

Appellate Case: 14-3601    Page: 8    Date Filed: 01/30/2015 Entry ID: 4239642

29 C.F.R. § 552.6 .................................................................. 9, 14

29 C.F.R. § 552.101(a) ......................................................... 11, 28

29 C.F.R. § 552.101(a), (b) ....................................................... 11

Fed. R. Civ P. 26(a) ............................................................ 58, 62

Fed. R. Civ. P. 26 (a)(1)(A)(iii) ................................ 1, 48, 55, 57, 58, 59

Fed. R. Civ. P. 26 (a)(1)(B) ........................................................ 58

Fed. R. Civ. P. 37 (b) .......................................................... 1, 62, 70

Fed. R. Civ. P. 37 (c) ....................................................... 1, 58, 62, 70

Fed. R. Civ. P 52 (a) ................................................................ 8

Appellate Case: 14-3601     Page: 9     Date Filed: 01/30/2015 Entry ID: 4239642

## <u>STATEMENT OF ISSUES</u>

1.      Whether District Court was correct in granting UCP's Motion for Summary Judgment and denying Plaintiffs' Motion for Partial Summary Judgment as to FLSA/AMWA claims.

     *Welding v. Bios Corp.,* 353 F.3d 1214 (10th Cir. 2004)

     *Solis v. FirstCall Staffing Solutions, Inc.,* 2009 U.S. Dist. LEXIS 107543 (W.D. Mo. 2009)

     *Terwilliger v. Home of Hope, Inc.*, 21 F.Supp.2d 1294 (N.D. Okla. 1998)

     *Johnston v. Volunteers of America, Inc.,* 213 F.3d 559 (10th Cir. 2000)

2.      Whether District Court was correct in granting UCP's Motion for Summary Judgment as to Lisa Fezard's retaliation claim.

     *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713 (8th Cir. 2011)

     *Brown v. L & P Industries,* LLC, No. 5:04CV0379-JLH, 2005 U.S. Dist. LEXIS 39920 (E.D. Ark. Dec. 21, 2005)

     *Pearson v. City of Big Lake*, 689 F.Supp.2d 1163 (D. Minn. 2010)

3.      Whether District Court was correct in granting UCP's Motion for Sanctions.

     Fed.R.Civ.P. 26(a)(1)(A)(iii)

     Fed.R.Civ.P. 37(b),(c)

     *Hoffman v. Construction Protective Services, Inc.*, 541 F.3d 1175 (9th Cir. 2008).

1

## STATEMENT OF THE CASE

Lisa Fezard was terminated from UCP for insubordination and failure to comply with the plan of care approved by the State of Arkansas for her client, CM. (App. 1041–1068; 1088–1103). On February 23, 2012, the Division of Developmental Disabilities ("DDS") performed an inspection of the Fezards' property, including the cabin in which CM lived and for which he paid $10,000.00 in prepaid rent pursuant to a written lease. (App. 1053–1055; 1108). DDS noted Lisa Fezard was not present with CM, and it did not appear to DDS she was working with CM on goals and objectives outlined in the plan. (App. 1053–1055). Word of this problem reached UCP President Larry Stang ("Stang") on or about March 2, 2012, and on or about March 6, 2012, he received the written DDS report. (App. 1061; 1057–1058). A day prior, March 5, 2012, Lisa Fezard sent an insubordinate email to her superiors, and on that day, Paula Rader ("Rader"), Program Administrator, decided to terminate Lisa Fezard. (App. 1065–1066). Rader informed Stang of her decision, and he informed Rader of the forthcoming DDS report. (App. 1046; 1065–1066). On March 8, 2012, Rader emailed Lisa Fezard to schedule a meeting wherein Lisa Fezard would be notified of her termination. (App. 1066; 1123). At the meeting on March 15, 2012, Lisa Fezard was notified of her termination. (App. 1066; 1081).

Appellate Case: 14-3601    Page: 11    Date Filed: 01/30/2015 Entry ID: 4239642

Thereafter, the Fezards filed the instant Complaint alleging they were wrongfully classified as exempt in providing companionship care and that Lisa Fezard was terminated in retaliation for contacting the DOL. (UCP App. 001–021). The District Court granted UCP's Motion for Summary Judgment as to Lisa Fezard's retaliation claim.

In furtherance of their misclassification argument, Appellants claimed the private homes in which they provided companionship services to their disabled clients were not the "private homes" of the clients. The District Court reviewed the law and applied the facts of each living situation comparing control of the premises as between the client and UCP, not as between Appellants and the clients. The District Court granted UCP's Summary Judgment Motion and denied Appellants' Motion for Partial Summary Judgment. (Add. 006–0027).

The District Court also granted UCP's Motion for Sanctions. (Add. 001–005). The case turned on the application of the companionship exemption which required UCP to conduct a fact-intensive analysis of each living situation. Appellants resisted their discovery obligations from the outset, failing to provide damages calculations in initial disclosures, resisting party depositions, and providing insufficient discovery responses with unfounded objections. (UCP App. 212–226; App. 1–75). Following the motion to compel, the District Court overruled Appellants' objections and ordered them to provide discovery to UCP.

3

Appellants failed to provide discovery as ordered and resisted UCP's attempts to procure documents via subpoena by filing motions to quash. (UCP App. 201–211; 279–280; 338–342; 355–368; 371–373; 410; 442–586). Appellants withheld documents, including written statements made by the Fezards to the DOL involving the exact allegations contained in their Complaint.

After business hours on the discovery deadline, Appellants revealed their damages calculations for the first time. UCP questioned each Appellant about their damages during depositions, yet none provided an answer. However, the day after the final deposition, Appellants provided detailed damages calculations. (App. 716; 821). Due to Appellants' discovery violations, the District Court granted the only sanction which could rectify the harm caused to UCP and disallowed Appellants' damages at trial. (Add. 001–005).

Appellate Case: 14-3601    Page: 13    Date Filed: 01/30/2015 Entry ID: 4239642

## SUMMARY OF THE ARGUMENT

The undisputed facts prove UCP held no ownership interest/control over each private home at issue. UCP could not force a client to move into/out of a home; that decision was between the Appellant and client. Appellants wrongfully focused on their ownership/control of the homes, whereas the District Court followed established law and compared the control of the homes between clients and UCP and found the homes were the private homes of the disabled clients.

Lisa Fezard was terminated for insubordination and a negative report from DDS regarding the care of her client. Lisa Fezard wholly failed to establish evidence of pretext, and she even failed to address the unfavorable DDS report in her appellate brief.

Appellants withheld relevant discovery, including their damages calculations required by Rule 26. The District Court properly analyzed all sanction options and disallowed Appellants' damages at trial.

There is no basis to replace the District Court judge if the case is reversed.

5

# ARGUMENT

## I. District Court Properly Granted UCP's Summary Judgment Motion and Denied Appellants' Partial Summary Judgment Motion

The Companionship Exemption to the FLSA applies to each living situation at issue. The homes in which UCP clients lived and received companionship services from Appellants were "private homes" – not boarding homes or lodging houses operated by UCP as a business enterprise open to the public.

The homes were "private homes" whose owners/renters (Appellants) decided to allow disabled persons to live in a family-like environment instead of being institutionalized. It is undisputed UCP had no control over the homes, and because that fact was set in stone, Appellants twisted the law to suit their claims. Appellants wrongfully focused attention on "control" and "management" of private homes as between clients and themselves. No court in the country has engaged in such a comparison when deciding the issue of a "private home." To do so would omit the necessary analysis of the third-party services provider.

In companionship cases, "control" is always measured between clients and third-party service providers. *See Solis v. FirstCall Staffing Solutions, Inc.*, 2009 U.S.Dist. LEXIS 107543, *16 (W.D. Mo. 2009)(where third-party supplier of services required disabled participants to have a roommate who used the same service provider); *Linn v. Developmental Services, Inc.*, 891 F.Supp. 574, 579

6

(N.D. Okla. 1995)(where third-party supplier of services made decisions on number and composition of people in residences); *Terwilliger v. Home of Hope, Inc.*, 21 F.Supp.2d 1294, 1300 (N.D. Okla. 1998)(finding homes were "private homes" in part because third-party supplier of services did not choose housemates for disabled clients); *Johnston v. Volunteers of America, Inc.,* 213 F.3d 559, 562-63 (10th Cir. 2000)(where third-party supplier of services set up shared living arrangements with other clients, required other clients to have same service provider, and forced clients to move if roommates chose another service provider).

Appellants' appeal is tediously hinged upon the faulty assertion that "application of the exemption turns on whether a residence is a client's private home, focusing on the client's ownership, control and maintenance of the residence." (Appellant's Brief at 45). However, in order to prove a lack of control by one party, it is necessary to compare control held by another party. In companionship exemption cases, that always means looking to the third-party supplier of services – not the workers/Appellants. If Appellants truly thought that simply showing the clients' lack of control over the premises was worthwhile in a vacuum, they would not have gone to such great measures to highlight their own control of the premises. While Appellants undoubtedly had more control over the homes, it is a distinction without a consequence, because control is compared between the client and the third-party services provider when deciding whether a

7

home is a "private home." UCP held no sway over the private homes at all. When the district court analyzed the facts and applied those facts and inferences to the law, it properly found the homes were private homes exempt from the FLSA.

A. **Standard of Review**

The facts necessary to a proper determination of the legal question whether an exemption to the FLSA applies in a particular case should be reviewed by the courts of appeals pursuant to Fed.R.Civ.P. 52(a) like the facts in other civil bench-tried litigation in federal courts, e.g. under a clearly erroneous standard. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 710 (1986)(facts necessary to a proper determination of the legal question whether §213(a)(1) exemption applied in a particular case reviewed under clearly erroneous standard). Although the *Icicle* case did not involve the exact exemption, the logic is sound. Fundamentally, the court must draw inferences from factual findings relative to work tasks and responsibilities in applying the regulations and interpretations promulgated under §213(a)(1) of the FLSA, 29 U.S.C. §§ 201-219. *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1223 (5th Cir. 1990). Specifically regarding the companionship exemption, the key factors described in *Welding v. Bios Corp.*, 353 F.3d 1214 (10th Cir. 2004), used to determine whether a residence is a private home, are questions of fact reviewed under a clearly erroneous standard. *Fowler v. Incor*, 279 Fed.Appx. 590, 593, 2008 U.S. App. LEXIS 10213 (10th Cir. 2008)(*citing Sanders v. Elephant*

Appellate Case: 14-3601    Page: 17    Date Filed: 01/30/2015 Entry ID: 4239642

*Butte Irrigation Dist. of N.M.*, 112 F.3d 468, 470 (10th Cir. 1997). The District Court was required to find historical facts and draw factual inferences from those facts in order to apply 29 U.S.C. 213(a)(15), and the appellate court should review those findings/inferences as applied to the *Welding* factors for clear error.

Although the answer to the question of whether a particular living unit was a private home (and excluded from overtime pay) is a question of law reviewed *de novo*, in the great majority of cases, the district court's findings of fact/inferences, if carefully set forth and supported by the record, will compel the legal conclusion that a given employee is or is not exempt. *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226-1227 (5th Cir. 1990). "Absent some fundamental legal error, those conclusions will usually stand undisturbed on appeal." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990), *citing Icicle Seafoods*, 475 U.S. at 714.

In the case at bar, the District Court's findings and conclusions should remain firmly intact.

### B. <u>Applicable Law - Companionship Exemption</u>

Appellants were exempt under the Companionship Exemption. *See* 29 U.S.C. §213(a)(15); 29 C.F.R. §552.6. To fall within the Companionship Exemption, an employee must first be classified as a "domestic services employee." *See Terwilliger v. Home of Hope, Inc.*, 21 F.Supp. 2d 1294, 1299 (N.D. Okla. 1998). The determinative factor in domestic services employment is

9

that the employment must occur in or about a "private home." *See id.* The applicable statutory exemption and regulations related to a "private home" state, in pertinent part:

> "The [minimum wage and overtime] provisions of [the Act] <u>shall not</u> apply with respect to-- . . .
> (15) . . . any employee employed in domestic service employment to provide <u>companionship services</u> for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary [of Labor]); . . ."

29 U.S.C. §213(a)(15)(emphasis supplied).

> "[T]he term "domestic service employment" refers to services of a household nature performed by an employee <u>in or about a private home</u> (permanent or temporary) of the person by whom he or she is employed."

29 C.F.R. §552.3 (emphasis added).

The regulations expound upon what is considered a "private home" and specifically note a "private home" could be fixed or temporary. The regulation states, in pertinent part:

> (a)    … The domestic service must be performed in or about the private home of the employer <u>whether that home is a fixed place of abode or a temporary dwelling</u> as in the case of an individual or family traveling on vacation.  A separate and distinct dwelling maintained by an individual or a family in <u>an apartment house, condominium or hotel may constitute a private home</u>."
>
> (b)   Employees employed in dwelling places which are <u>primarily rooming or boarding houses</u> are not considered domestic services

Appellate Case: 14-3601     Page: 19     Date Filed: 01/30/2015 Entry ID: 4239642

employees. The places where they work are <u>not private homes but commercial or business establishments</u> . . . ."

29 C.F.R. §552.101(a),(b)(emphasis added).

Neither the Supreme Court nor the Eighth Circuit has interpreted the meaning of the term "private home" under 29 C.F.R. §552.3. *See Solis v. FirstCall Staffing Solutions, Inc.*, 2009 U.S. Dist. LEXIS 107543, *7 (W.D. Mo. 2009). However, the Tenth Circuit has done so and noted that the DOL's definition of "private home" exists along a continuum, at one end of which is a traditional single family home in which a single family resides, and at the other end of which is an institution primarily engaged in the care of the sick, the aged, the mentally ill or a boarding house used for business or commercial purposes. *See id* at * 7 (*quoting Welding v. Bios Corp.,* 353 F.3d 1214, 1217 (10th Cir. 2004). The key inquiries are who has ultimate management control of the living unit (comparing the services provider to the client) and whether the living unit is maintained primarily to facilitate the provision of assistive services. *See id.*

In 1998, the *Terwilliger* court relied on a four-part fact-specific test to determine whether a dwelling was a private home. *See Terwilliger v. Home of Hope, Inc.,* 21 F.Supp. 2d at 1299. Those factors were: 1) the facility's source of funding; 2) access to the facility by the general public; 3) whether the facility was organized for profit or is a nonprofit organization; and 4) the size of the

11

organization.  *See id.*  Clearly, the aim of the inquiry in *Terwilliger* was whether the home was operated as a business venture, e.g. a boarding house controlled by the services provider.

A few years later, the *Welding* court identified six non-exclusive factors in an effort to provide a framework for future courts in assessing whether a residence was a "private home."  All of the factors were useful in comparing the level of control between clients and the third-party service provider.  The factors included: 1) when the client began living in the home; 2) whether the client had an ownership or leasehold interest in the home; 3) who maintained the home; 4) whether the client could remain in the home absent contracting with the services provider; 5) the cost/value of the services relative to the total cost to maintain the home; and 6) whether the service provider used any part of the home for provider's own business.  *See Welding*, 353 F.3d at 1220.

In addition to the *Welding* factors, the *Solis* court looked to additional factors in making the determination of whether the homes in which a client lived were "private homes."  *See Solis* at *16.  In *Solis*, the Missouri district court found the apartments at issue were not "private homes," but the distinctions between the apartments in *Solis* and the homes in the instant case are numerous.  Some of the *Welding* factors, plus additional factors, played significantly into the court's

12

decision in finding the apartments were not private homes, and all the factors were analyzed in light of whether the service provider controlled the living situation.

For instance, the payment of rent and utilities at the apartments was "not what one typically would find with a private residence." *Solis* at \*11–\*12. The service provider, FirstCall, opened one bank account in the name of FirstCall into which the state deposited the clients' disability and SSI payments. *Id*. FirstCall withdrew and paid the clients' rent with no involvement from the clients. *Id.* The KCRC (equivalent to DDS) would also determine how much spending money each client could have, and that money would be deposited in the FirstCall account, and FirstCall could withdraw the money. *Id.* Also, FirstCall employees had keys to the clients' apartments. *Id.* at \*16. There was a requirement that all clients have a roommate and that all roommates use FirstCall. *Id.* It is evident the *Solis* court looked to whether the third-party supplier of services – FirstCall – held control over the homes. In the case at bar, it is equally evident and undisputed UCP engaged in no such conduct related to the control of any homes.

Appellants claim that *Solis* held "if it is the client's name on the lease, the property is his or her private home, and if it is not, the property is not a private home." (Appellant's Brief, 21). Such a statement is flat misleading. Instead, *Solis* looked at who owned the living unit and held that while "Clients did not always sign the leases, [that did] not change the fact that they [clients] – <u>not FirstCall or</u>

13

any other entity – had legal possession of the property.  Since Clients had superior legal rights to the apartments, this factor weigh[ed] in favor of a finding that the apartments were 'private homes.'" *Id.* at *3 (emphasis added).  Once again, the "superior legal rights to the apartments" referenced by the *Solis* court compared the client's rights to the service provider's rights.

Once the "private home" requirement is established by a proper comparison of control of the premises, in order to qualify under the Companionship Exemption, the services rendered to the client must be considered "companionship services."  According to the regulations, companionship is defined as follows:

> As used in section 213(a)(15) of the Act, the term *companionship services* shall mean those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: *Provided, however,* that such work is incidental, *i.e.,* does not exceed 20 percent of the total weekly hours worked.

29 C.F.R. §552.6 (emphasis in original).

The regulations contain an exception to the Companionship Exemption, *e.g.* where general household services exceed twenty percent (20%) of the total weekly hours worked.  When the household services exception applies, the exemption cannot be used, and the general FLSA overtime rules govern.  *See Linn v.*

14

*Developmental Services of Tulsa, Inc.*, 891 F.Supp. 574, 578 (N.D. Okla. 1995). However, the question of companionship services and the household duties exception are not at issue in this appeal.[1]

As applied to each Appellant in this case, the undisputed facts prove Appellants were domestic services employees providing companionship services to clients in or about a private home. The Companionship Exemption applies, and Appellants are not entitled to overtime pay or any relief at all.[2]

Ultimately, the regulations and case law are clear that the whole point of making this determination about a private home is to decide whether the services were rendered at a private home or a commercial/business establishment. Those are the two options pitted against one another. Appellants ignore the consequence

---

[1] Appellants failed to argue the services they provided were not companionship services or that they engaged in general household services for more than twenty percent (20%) of the total weekly hours worked. As such, there is no question for review on these two issues.

[2] In accordance with Section 11-4-203 of the Arkansas Minimum Wage Act ("AMWA"), employees employed on a casual basis in domestic service employment to provide companionship services for individuals who are unable to care for themselves because of age or infirmity are expressly excluded from the definition of an "employee," thus no claims could arise under that statute. *See* Ark. Code Ann. §11-4-203(3)(O)(ii). Additionally, Appellants did not argue on appeal the District Court wrongfully denied UCP's summary judgment motion as to their claims for unjust enrichment. Where there is no meaningful argument on a claim in an appellant's opening brief, it is waived. *Fatemi v. White*, 2015 U.S. App. LEXIS 89, *49 (8th Cir. Ark. Jan. 6, 2015).

15

of finding that a home is not a private home. The opposite of a private home is a dwelling that is a commercial/business establishment. Commercial/business establishments are controlled by employers, and that is why courts look to whether the third-party supplier of services controlled the premises. The homes at issue were not commercial in nature; they were private homes that served as family-like environments for disabled UCP clients.

### C. <u>Individual Analysis of Clients' Living Quarters</u>

As discussed *supra*, the District Court's findings of facts/inferences are reviewed on a clearly erroneous basis, not *de novo*. Because those facts/inferences were gleaned from the record that Appellants acknowledge are undisputed (Appellants' Brief, 24), those facts/inferences remain intact unless they were clearly erroneous.[3] The District Court's determination that each home was a private home exempt from the FLSA is the only decision which can be reached based upon the facts/inferences identified and discussed by the District Court.

Appellants claim a proper analysis of the undisputed facts under *Welding* must yield a different decision, but as discussed herein, the District Court analyzed all applicable *Welding* factors. Also, the *Welding* factors are non-exclusive, e.g. the District Court was free to analyze other factors. *See Solis* at *3. Regardless,

---

[3] Even if this Court applies the *de novo* standard of review to all aspects of this appeal, the facts discussed in UCP's underlying briefing demand the same finding the homes at issue were the client's private homes and thus exempt from the FLSA. (App. 77–707; App. 1531–1696; App. 2261–2269).

Appellate Case: 14-3601    Page: 25    Date Filed: 01/30/2015 Entry ID: 4239642

the District Court analyzed each *Welding* factor and properly concluded the homes were all private homes. Moreover, the District Court footnoted each Appellant's deposition testimony and discovery responses in its Order, signaling that it had considered all "facts pertaining to each [Appellant] and their clients" contained in the record. (Add. 013–025).

Significantly, the District Court made several "omnibus" findings of fact regarding *Welding* factor Nos. 2, 3, 4 and 5 that impacted all Appellants, thus the District Court did not have to repeat itself under each individual heading in its Order. (Add. 010–013). The District Court correctly concluded that for all Appellants, *Welding* factor No. 5 was inapplicable, because the costs of maintaining the client's living unit were also the Appellants' personal costs in maintaining their homes. (Add. 013). In other words, Appellants' costs in maintaining their homes were not related to the provision of companionship services – those costs existed regardless of whether a disabled client lived in the home or not. The District Court also concluded that in all instances, whether the client could remain in the home after terminating UCP services was determined by the specific relationship between each Appellant and client. The client was not automatically required by UCP to move out of the home. (Add. 013). Therefore, for every Appellant, the District Court found *Welding* factor No. 4 favored a finding the homes were private homes. Additionally, the District Court found that

17

all homes (other than Helen Buckley's) were personally owned/rented by Appellants (*Welding* factor No. 2); UCP had no interest in any home (*Welding* factor No. 2); UCP did not designate which client would reside in any home (*Welding* factor No. 4); and UCP did not maintain any home or pay household bills (*Welding* factor No. 3). (Add. 012). All omnibus findings of fact applied to all Appellants and necessitated a finding the homes were the private homes of the UCP clients and not boarding houses operated commercially by UCP.

### 1. <u>Deloma Bennett</u>

Bennett claims the District Court failed to "analyze and apply any of the *Welding* factors to determine whether Deloma Bennett's home was her UCP client JO's 'private home.'" (Appellants' Brief, 25). This is not true. In addition to the omnibus findings discussed *supra*, the District Court expressly noted that JO moved into the Bennett home in 1997 before Bennett began working for UCP (*Welding* factor No. 1); UCP did not have any ownership interest in the home (*Welding* factor No. 2); Bennett and her husband managed and maintained the home; UCP did not (*Welding* factor No. 3); and JO remained in the home even after Bennett stopped working with him via a companionship program (*Welding* factor No. 4). Also, the District Court properly noted that Bennett's husband was JO's legal guardian, and they all planned to move out of state together. Although the District Court made a finding of fact (in addition to *Welding* factors) that

18

negatively impacted Bennett's self-serving argument that her home was not also the private home of her husband's legal ward, it was wholly proper for the District Court to do so. The fact that JO lived with his legal guardian is more probative to a finding that it was his private home than any *Welding* factor.

The District Court's findings of fact/inferences were not clearly erroneous. The only viable conclusion is that the home was JO's private home, and Bennett was exempt from the FLSA/AMWA.

### 2.  Sam Adams

The District Court found that Adams' client, MS, remained in the home even when Adams did not work for UCP during a break in Adams' employment with UCP. (*Welding* factor No. 4). Adams testified that "no matter what happened to [Adams] . . . he [MS] didn't have to go anywhere . . ." (Add. 015) (*Welding* factor No. 4). Also, Adams and his wife maintained the home, not UCP. (*Welding* factor No. 3). The District Court appropriately noted that MS grew up with Adams' children, had become part of his family after living with them for over twenty (20) years, and paid $400.00 per month for room and board. Although not *Welding* factors, such facts certainly speak to the issue of whether MS lived in his private home. Together with the omnibus findings of fact and the District Court's consideration of all facts/inferences in the record regarding Adams and his client

19

and UCP, the District Court properly concluded the home was a private home, and Adams was exempt from the FLSA/AMWA.

### 3. <u>Karen Hornback</u>

In addition to the omnibus findings of fact related to Karen Hornback (*Welding* factor Nos. 2–5), Karen Hornback admitted her disabled client, KS, would be allowed to continue to live with her if Karen Hornback no longer worked for UCP. (*Welding* factor No. 4). (App. 327). UCP did not control or own the Hornback's home. (*Welding* factor No. 2). Also, UCP did not maintain the home or use the home for any business purpose. (*Welding* factor Nos. 3, 6). Finally, the District Court noted that Karen Hornback claimed KC as a dependent on her tax returns. (Add. 016). While not a *Welding* factor, it is certainly probative of whether KC was living in her own private home. Karen Hornback obviously represented to the IRS that KS lived there.

The District Court's finding of facts/inferences regarding Karen Hornback were not clearly erroneous, and Appellant has not shown any factual dispute. Instead, Appellant argues the effect of these facts results in a finding that Karen Hornback's home was not the private home of KS. However, case law does not support Appellants' argument. Courts always compare control between the client and the service provider to make a decision, not between the client and the worker.

### 4. <u>Willis Hornback</u>

Appellate Case: 14-3601     Page: 29     Date Filed: 01/30/2015 Entry ID: 4239642

The District Court properly found that Willis Hornback owned the home in which he provided companionship services to JM, and UCP did not own it. (Add. 016)(*Welding* factor No. 2). Additionally, the District Court found that JM lived with Willis Hornback prior to working for UCP. (*Welding* factor No. 1). UCP did not maintain the residence, did not exert any control over the home, and did not use the home for any business purpose. (*Welding* factor Nos. 3, 6). The District Court properly noted that Willis Hornback claimed JM on his tax returns and JM paid $500.00 per month for room and board. (Add. 016). In addition to the District Court's omnibus findings (*Welding* factor Nos. 2–5), the only proper conclusion is that JM lived in a private home.

It is important to address a fallacy raised by Appellant regarding JM. Appellant noted that JM's guardian removed him from waiver services and moved JM out of the Hornbacks' home. Then, Appellant makes the logical misstep that "if the residence had been JM's private home, his guardian would not have needed to remove him." (Appellants' Brief, 31). Such a statement is not supported by the record. Willis Hornback had no idea why JM's guardian removed him (App. 0362), only that JM's guardian moved him to Missouri. (App. 1295). In other words, JM's guardian did not take JM out of the home *because* he took JM out of the waiver program/UCP's services, he simply took JM out of the waiver program

Appellate Case: 14-3601    Page: 30    Date Filed: 01/30/2015 Entry ID: 4239642

and out of the Hornbacks' home for unknown reasons. This is but one example of Appellants' twisting of facts to support their position.

### 5.  Debra Joiner

The District Court noted that Debra Joiner's client, SA, did not live with her prior to Joiner's employment with UCP, a factor favorable to Joiner's position. (*Welding* factor No. 1). The remainder of the factors weighed in favor of a finding the homes in which Joiner and SA lived were private homes. Joiner rented the homes; but UCP had no interest in the homes, did not manage the homes or maintain the homes, and did not use any space for business purposes. (*Welding* factor Nos. 2, 3, 6)(Add. 017). In addition to the District Court's omnibus findings, it found that Joiner testified that SA's guardian expected SA to live with Joiner on a permanent basis. While not a *Welding* factor, it was proper for the District Court to consider the permanency of the living arrangement. Established case law allows the District Court to consider such relevant information in addition to the *Welding* factors.

Joiner notes that when she decided to leave UCP, she told AS that AS had to move out. (Appellants' Brief, 32). Apparently, Joiner believes this fact indicates the home was not AS's home, because Joiner, not AS, controlled the situation. However, Joiner wholly misses the point – UCP had no say as to whether AS could or could not stay in the home. This latter fact is the one of consequence. Joiner

22

attempts to use her own control of the home in an improper attempt to saddle UCP with control, but UCP could not make AS leave and certainly did not require she do so.

### 6.  Susanne Jones

The District Court specifically noted, in addition to its omnibus findings (*Welding* factor Nos. 2–5) UCP had no ownership in Jones' home, did not manage the home, and did not maintain the home.  (*Welding* factor Nos. 2, 3).  Those factors alone were sufficient for the District Court to find the home was a private home exempt from the FLSA.  In addition, the District Court found that SA decided to live with Jones on a permanent basis; she had her own bedroom and bathroom; bought her own bed, television and other electronics; and had full use of the home.  (Add. 018).  Also, SA had no relationship with her family.  Under Jones' misguided theory of the companionship exemption, SA could never have her own private home, but the District Court properly found the home to be SA's private home when comparing the control SA had over the home to the control of UCP (which was none).

Jones claims that because the District Court did not specifically mention a separate client, WS, that it erred.  However, the facts regarding the lack of control by UCP over the home were exactly the same as applied to both WS and SA.

23

None of the other factors mentioned by Jones in her brief change the outcome. All of her "undisputed facts" simply indicate that she controlled the home and not UCP. Appellants continually (and wrongfully) ask the Court to compare control between themselves and the client and completely disregard the lack of control by UCP. No Court has analyzed the issue of private homes in such a manner.

### 7. **Janeen Essary**

Essary claims the District Court failed to address "any" *Welding* factors. Essary failed to notice the District Court made omnibus findings that applied to every home at issue, e.g. UCP did not have any interest in her home; did not pay any bills; did not maintain the home; had no control over whether the client stayed or left; and that the cost of CM's care compared to Essary's expenses of maintaining the home had no bearing on the issue. The District Court found *Welding* factors 2–5 weighed in favor of a finding the home was the private home of Essary's client, CM. Additionally, the District Court noted UCP did not use any space in the home for its business. (*Welding* factor No. 6). At least five of the six *Welding* factors weighed in favor of a private home. Essary's representation to this Court that the District Court did not address "any" of the *Welding* factors is disingenuous.

Appellate Case: 14-3601    Page: 33    Date Filed: 01/30/2015 Entry ID: 4239642

Essary points the Court to the fact that she made CM move out of the home. (Appellants' Brief, 35). By highlighting her control of the home, the obvious conclusion is that UCP had no control over the situation, which is the fact that matters.

### 8.    <u>Tiffany Ellis</u>

Ellis incorrectly claimed the District Court did not address "any" *Welding* factors. Actually, the District Court addressed the *Welding* factors and made a decision which was unfavorable to her. The District Court's omnibus findings impacted Ellis, and so did its specific findings that UCP did not own the home, did not manage or maintain the home, and did not use any space for its own business purposes. (*Welding* factor Nos. 2, 3, 6).

Interestingly, the District Court found that it was not UCP that orchestrated the living arrangement, but instead, it was LH's guardian and Ellis who came to an agreement. (Add. 020). While not a *Welding* factor, it certainly reflected upon the tenor of the relationship, and the obvious inference drawn was that UCP did not control the living situation. Additionally, LH had his own bedroom, shared a bathroom, spent all holidays with Ellis, etc. These facts were proper for the District Court to consider. *See Welding* at 1218 (holding that the object of evaluation is the living unit of the person receiving services and "[t]he client's living unit consists of the client's bedroom and the common areas to which the

25

client has access.").  Like other Appellants, Ellis claimed her client on her tax returns as a dependent living with her on a permanent basis.  (App. 502–503).  The District Court's findings/inferences regarding the *Welding* factors and other relevant facts leads to the obvious conclusion the home was a private home exempt from the FLSA.

### 9. __Albertine Winston__

The District Court properly found that UCP had no ownership in Winston's home, did not manage the home, did not maintain the home, and did not use the home for its own business purposes.  (*Welding* factor Nos. 2, 3, 6).  In its omnibus findings, the District Court properly noted the ratio of the value of services to the costs of maintaining the home was not a pertinent fact. Winston erroneously argued the District Court failed to consider the *Welding* factors when evaluating the applicability of the companionship exemption.

Winston made an inaccurate statement that is not supported in the record at page 38 of her brief:  "If Winston's home was AS's private home, AS would not have been required to move out after services ended."  There is nothing in the record to support the notion that AS moved out "after services ended."  Rather, Winston testified AS left Winston's home, because she wanted to live with younger people.  (App. 560–561).  The District Court took note of Winston's

Appellate Case: 14-3601     Page: 35     Date Filed: 01/30/2015 Entry ID: 4239642

testimony illustrating that AS had full control of the living arrangements and chose to move.

Moreover, UCP does not have a key to her house and has no contract with Winston for the use of her home. (App. 536–537, 566–567). These undisputed facts, contrary to Winston's assertions, cover *Welding* factors 2, 3, and 6.

The District Court properly determined that AS and NB paid for rent and groceries and lived nowhere else during the time each resided in Winston's home. In fact, NB died in the home in July of 2011. (App. 528–529). AS moved in approximately three months after NB died and used the same bedroom and bathroom that NB once used. (App. 525, 531). According to Winston, the payments for room and board were intended to cover "rent, utilities, etc." (App. 533). Winston further admitted that NB and AS lived with Winston on a "permanent basis." (App. 531–532, 535). NB and AS spent their holidays with Winston at the home. (App. 558–559).

Winston barely mentions JD in her brief, yet she contends the District Court "especially erred" when it concluded that the home was a "temporary private home" within the meaning of the exemption.[4] Winston has provided

---

[4] As a matter of fundamental fairness, Appellants' argument concerning JD is too vague and conclusory. UCP is left to guess as to how the District Court "especially erred," and it will be unfair for Appellants to provide a detailed argument in their reply brief, thereby foreclosing UCP a meaningful opportunity to respond.

Appellate Case: 14-3601    Page: 36    Date Filed: 01/30/2015 Entry ID: 4239642

companionship services to JD since 2004.  (App. 519).  JD lives with Winston on a weekend basis.  (App. 530).  JD used to stay with Winston every weekend, but at some point JD began staying with Winston on a weekend basis with alternating Sundays. (App. 516).  Winston did not challenge the District Court's finding that she did not provide over 40 hours of work on her "off" weekends.  (Add. 022).

JD's situation is no different than some other UCP clients described above. While JD never had a lease to live with Winston, a lease was not required for the home to be a private home pursuant to the FLSA.  According to regulations, a hotel room can constitute a temporary private home.  *See* 29 C.F.R. §552.101(a).  The District Court correctly observed that Winston's home constituted at "temporary home" for purposes of applying the companionship exemption.  29 C.F.R. §552.3; *see also Welding*, *supra.*

The District Court's logic is sound, supported by the record, and should be affirmed.

### 10 – 11.  Lisa Fezard and Frederic Fezard – Class Representatives

#### a.  Client, CM

The District Court properly found that Lisa Fezard's client, CM, lived alone in a cabin on the Fezards' property for which he pre-paid $10,000.00 in rent for a lease from November 1, 2011 through June 1, 2013.  (Add. 023).  The written lease noted the fact that all utilities were included in the lease payment.  (App. 226–227).

28

CM paid for his own television/internet service at his cabin. Both Fezards testified that CM planned to live in the cabin permanently and could come and go from the cabin at his discretion. (Add. 023). After Lisa Fezard was terminated, CM moved out, but Lisa Fezard testified that CM could have stayed in the cabin and received companionship services from other providers. (App. 208). In fact, CM moved out of the cabin a year before his lease terminated and the Fezards refused to refund his money. (Add. 023; App. 1082–1085).

As with all other homes in this case, the District Court found that UCP had no interest in the cabin, did not manage the cabin, did not maintain the cabin and did not use the cabin for its own business purposes. (*Welding* factor Nos. 2, 3, 6).

In their brief, the Fezards highlight facts to show they owned, managed and maintained the cabins in an effort to prove the cabin was not CM's. No one disputes the Fezards owned, maintained and controlled the cabins. Indeed, UCP agrees, because those facts undisputedly prove that UCP had no interest or control over the cabins which leads to the clear conclusion the homes were the private homes of the clients. Control is always measured between the client and the service provider, and in these situations, UCP controlled nothing.

### b.  Client, JL

The District Court properly found that JL lived in his own cabin on the Fezards' property. (Add. 024). JL had a written lease with the Fezards and paid

Appellate Case: 14-3601    Page: 38    Date Filed: 01/30/2015 Entry ID: 4239642

the Fezards $450.00 per month which included utilities and maintenance on the cabin. (App. 263–264). UCP had no ownership interest in the cabin; did not manage the cabin; did not maintain the cabin; and did not use any space in the cabin for its business. (*Welding* factor Nos. 2, 3, 6). After the Fezards were terminated from UCP, JL was allowed to stay in his cabin and remains there to this day. Frederic Fezard became JL's legal guardian. (Add. 024; App. 241). This latter fact is more pertinent than any *Welding* factor in determining whether JL lived at his own private home—he lives with his guardian. Together with the omnibus findings of the District Court, it is clear that UCP had no control over JL's living situation. Thus, it was JL's private home, and the Fezards were exempt from the FLSA.

### c.   Client, PH

The District Court did not make a ruling as to whether the Fezards' home served as PH's temporary private home on weekends. However, all of the facts regarding the Fezards' home and property applied to PH. This Court may affirm the judgment of the District Court on any basis found in the record. *Gilmore v. Novastar Financial Inc.*, 579 F.3d 878, 884 (8th Cir. 2009). The record, and the District Court's prior findings, prove UCP had no control over the living situation for PH on weekends at the Fezards. As such, the Fezards' home was PH's temporary private home on the weekends. Fred Fezard confirmed this in his

Appellate Case: 14-3601    Page: 39    Date Filed: 01/30/2015 Entry ID: 4239642

discovery responses when he stated that PH "lives with us on the weekends." (App. 270).

Regardless, the District Court properly found that the Fezards failed to provide evidence they worked over forty (40) hours with PH during the weekends. Fred Fezard admitted in his deposition that he did not work more than forty (40) hours per weekend with PH. (Add. 025).

The Fezards' only response is that Fred's companionship-exempt work with Lisa Fezard's biological son, BB, during the week should count toward allegedly non-exempt work for PH on the weekend. This is the first time the Fezards have made any such argument, and they do not cite any legal support that exempt hours are used to calculate non-exempt overtime. Any such argument should not be considered. *See Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1212 (8th Cir. 1993)("By their failure to . . . provide citations to authorities that would lead us to resolve any questions, plaintiffs have waived the right to have us consider whether each ruling was correct."). The Fezards failed to provide this Court with any authority that the District Court was required to include exempt hours when calculating allegedly non-exempt weekend hours. In fact, the Fezards never made this argument in their underlying pleadings, e.g. that Fred Fezard's companionship work with his step-son BB should be included in the overall tally of hours when determining overtime hours for allegedly non-exempt

31

time with PH.  (App. 1140–1174; 1175–186; 1187–1196; 2061–2074; 2279–2285).

In the underlying briefing, the only basis that Fred Fezard raised in support for

overtime pay for PH was that PH was not cared for at his private home.

Appellants' underlying brief stated:  "Lisa Fezard was the direct caregiver for

[CM] on a full-time basis, and [JL] and [PH] on (sic) part-time basis.  Frederic

Fezard took care of [CM] and [PH] on the weekends."  (App. 1129).  Fred Fezard

did not mention his step-son, BB, at all.

The only time it arguably came up in the record was during Fred Fezard's

deposition when counsel for Appellants twice assured counsel for UCP that Fred

Fezard was not seeking overtime wages for the care of BB.  (App. 0235, 1651).

When Appellants finally revealed their damages calculations, Fred Fezard made a

generic claim that he worked "40+ hours per week" with BB.  (App. 845).

Ultimately, Fred did not provide the District Court with timesheets for BB to

support his claims that he worked more than 40 hours per week prior to the

weekend, nor did he make that argument.  If a party fails to assert a legal reason

why summary judgment should not be granted, that ground is waived and cannot

be asserted or raised on appeal.  *Ames v. Nationwide Mutual Ins. Co.*, 760 F.3d

763, 770-71 (8th Cir. 2014)(*citing Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667,

678 (1st Cir. 1995).  Also, it is a well-settled rule that a party opposing summary

judgment must inform the trial judge of the reasons, legal or factual, why summary

judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal. *Id.* (*citing Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983). Therefore, the District Court's finding that Fred Fezard did not produce evidence that he worked more than 40 hours per week with PH should be affirmed. This Court should not entertain the novel argument contained in Appellants' footnote 1 which they failed to argue to the District Court as a basis for finding that Fred Fezard was entitled to overtime wages for caring for PH. Again, Fred Fezard's only argument below was that the care took place at somewhere other than PH's private home.

As for Lisa Fezard, it is clear she cared for CM at CM's private home and thus was exempt from overtime pay. Lisa has also failed to provide the Court with any legal support that a calculation of her alleged non-exempt overtime hours spent with PH should include her exempt work with CM.

### 12. <u>Helen Buckley</u>

#### a. <u>Client, JL (Fred Fezard's Ward)</u>

The District Court properly found that JL's cabin was his private home for all the reasons discussed above. Buckley lived at a separate residence and had to leave her own home and drive to JL's cabin to care for him there. (App. 0274 – 0275). Although Buckley claimed she sometimes took care of JL in her home, the District Court properly found that Buckley did not own/rent the home, and neither

Appellate Case: 14-3601    Page: 42    Date Filed: 01/30/2015 Entry ID: 4239642

did UCP. It was owned by the Fezards. (Add. 024–025). This situation brings Appellants' misguided theory on ownership and control of these homes under the microscope. Appellants cannot argue that the worker, e.g. Buckley, owned the home, therefore, it was not JL's private home. In other words, Appellants cannot prop up the worker against the client in this instance. Indeed, the home at issue was not owned by Buckley, JL, <u>or</u> UCP. The question is who had "superior legal rights" to the property as compared to UCP? *See Solis* at *3. Unmistakably, both Buckley and JL had superior rights to UCP, because UCP had no legal rights to the home at all. Also, because of the unique situation in which Buckley found herself – not owning the cabin of her client – she admitted she had no authority to tell JL to leave, even if he were no longer served by UCP. (App. 284–285). Of course, because Fred Fezard was JL's guardian and JL had nowhere else to go, she would not have instructed him to leave anyway. (App. 285).

Regardless, the District Court found UCP did not own, manage, maintain or do business at JL's cabin or the Buckley home. (Add. 025)(*Welding* factor Nos. 2, 3, 6). Together with the omnibus findings (*Welding* factor Nos. 2–5), the only viable conclusion was that JL's cabin and Buckley's home were his private homes, and Buckley was exempt from the FLSA/AMWA.

### b. Client, CM

Appellate Case: 14-3601    Page: 43    Date Filed: 01/30/2015 Entry ID: 4239642

For the same reasons discussed above, the District Court properly concluded that CM's cabin was his private home. (Add. 026).

### c.    __Client, PH__

Buckley provided exempt companionship services to CM and JL. Therefore, those hours cannot be used to calculate allegedly non-exempt overtime hours for care of PH on the weekends. Appellants have not provided any legal authority for making such an argument, nor did they make the argument to the District Court below. As properly noted by the District Court, the record does not support a finding that Buckley worked more than 40 on a weekend with PH.

The same facts for the Fezard/Buckley homes hold true for PH, too. While Buckley simply points to PH and claims he had no ownership or control over the Fezards' property, the pertinent facts are that UCP had no control over the homes. UCP did not maintain the homes, did not conduct business at the homes, and could not decide whether PH chose to receive his services at the Fezards or elsewhere. (*Welding* factor Nos. 2–5). Once again, Appellants' vantage point is askew. This Court may affirm the judgment of the District Court on any basis found in the record. *Gilmore*, *supra*. The record proves the Fezards' home was the temporary private home of PH while he lived there on the weekends.

### 13.    __Appellants Generally__

Appellate Case: 14-3601    Page: 44    Date Filed: 01/30/2015 Entry ID: 4239642

Conceptually, the living arrangements of the UCP disabled clients are no different than other young adults who rent rooms from existing homeowners/landlords. Appellants' interpretation of the companionship exemption, taken to its logical conclusion, would restrict the exemption to only those circumstances where the UCP client lives in a home that they actually own or is owned by their family. (Add. 026). Such an interpretation would unreasonably exclude individuals who are too poor to own a home or whose family cannot or will not provide the disabled person a home. (Add. 026). Appellants' interpretation would result in a disparity of services based solely on home ownership.

Appellants also claim that because they filled out their timesheets, notes and mileage forms at home, and because meetings were held in their home, that amounted to evidence that UCP used the homes for UCP's own business purposes. (*Welding* factor No. 6)(Appellants' Brief, 43). Appellants inconsistently claim they have unfettered control over their homes, yet also claim that UCP controlled the homes through Appellants' own acts. Such an inconsistent position cannot be considered on summary judgment. *City of Mt. Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 280-81 (8th Cir. 1988)(Inconsistent argument rejected; summary judgment affirmed). All of Appellants' misguided efforts to bootstrap UCP with control over the private homes via their own acts makes it clear that

Appellants understand control is measured between clients and the employer—not the worker.

## II. District Court Properly Granted Summary Judgment on Lisa Fezard's Retaliation Claim

### A. Summary Judgment Standard; Bench Trial

Lisa Fezard improperly cited *Wallace v. DTG Operations, Inc.* and stated "summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where evidence of intent is often difficult or impossible to obtain." 442 F.3d 1112, 1117 (8th Cir. 2006). Conversely, this Court expressly noted such references to a varying standard of review in discrimination cases are contrary to Supreme Court precedent and held:

> Summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.
>
> *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011).

As such, the District Court properly set forth the standard for summary judgment in its Order dismissing Lisa Fezard's retaliation claim. (Add. 007–008).

Additionally, because the underlying case was set for bench trial, the District Court was free to reply upon inferences it gleaned from the facts presented. "[T]he

37

choice between permissible inferences is for the trier of facts.'" *Nunez v. Superior Oil Co.*, 572 F.2d. 1119, 1124 (5th Cir. 1978).  Where a jury is called for, the litigants are entitled to have the jury choose between conflicting inferences from basic facts.  *Id.*  However, where the judge is the trier of fact, as was the case here, he may be in a position to draw inferences at the summary judgment stage without resort to the expense of trial, unless there is an issue of witness credibility. *See id* at 1124-25.  There were no questions of credibility related to UCP's witnesses regarding retaliation.  Even assuming the District Court drew inferences which led to summary judgment, it was proper.

B.    **Retaliation**

In order to demonstrate a *prima facie* case of retaliation under the anti-retaliation provision of the FLSA, Lisa Fezard must show: (1) she participated in a statutorily protected activity; (2) that UCP took adverse employment action against her; and (3) there was a causal connection between Lisa Fezard's statutorily protected activity and the adverse employment action[5]. *See Ritchie v. St. Louis*

---

[5] In light of *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343 (2009) and *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2521 (2013), the causal connection provided by Lisa Fezard must be the "but-for" cause of the adverse employment action.  *See McBurnie v. Prescott*, 511 Fed. Appx. 624, 2013 U.S. Dist. LEXIS 5004, *3 (9th Cir. 2013)(citing to *Gross* and holding district court did not err in giving jury "but-for" causation instruction on plaintiff's FLSA retaliation claim).  There is no meaningful textual difference between the FLSA's anti-retaliation provision and the ADEA/Title VII provisions

38

*Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011); *see Montgomery v. Havner*, 700 F.3d 1146, 1148-49 (8th Cir. 2012).

Even applying the *McDonnell Douglas* burden shifting framework, Lisa Fezard's claims fail as a matter of law. Once UCP articulated legitimate, non-retaliatory reasons for Lisa Fezard's termination, she was required to show that those reasons were not the true reasons for the action, but merely a pretext for retaliation. *See Pearson v. City of Big Lake*, 689 F. Supp.2d 1163, 1188 (D. Minn. Feb. 25, 2010); *see Grey v. City of Oak Grove*, 396 F.3d 1031, 1035 (8th Cir. 2005). Proof of pretext requires more substantial evidence than a *prima facie* case because unlike evidence establishing a *prima facie* case, evidence of pretext is viewed in light of the employer's justification. *Gibson v. Geithner*, 2015 U.S. App. LEXIS 348, *8-9 (8th Cir. 2015). Plaintiff can successfully meet this burden by either showing the proffered explanation had no basis in fact or a plaintiff could directly persuade the court that a prohibited reason more likely motivated the employer. *See id.* at *9.

First, Lisa Fezard did not engage in protected activity prior to her termination. Second, in her brief, Lisa Fezard failed to address UCP's legitimate, non-discriminatory reasons, much less meet her burden of proof showing pretext.

---

for retaliation, and this Court should apply the "but-for" causation standard to Lisa Fezard's FLSA retaliation claim.

Appellate Case: 14-3601    Page: 48    Date Filed: 01/30/2015 Entry ID: 4239642

Lisa Fezard completely ignored the DDS inspection that took place on February 23, 2012, in which it was found that Lisa Fezard failed to comply with the newly instituted plan of care for her client. (App. 1096–1098). The DDS report was based in fact, and Lisa Fezard failed to persuade the Court that some other reason led to her termination.

### C.  Lisa Fezard Did Not Engage in Statutorily Protected Activity Prior to Termination and Could Not Prove a *Prima Facie* Case of Discrimination

#### 1.  Lisa Fezard's Alleged Workplace Complaints Not Protected Activity

Upon analyzing Lisa Fezard's testimony regarding alleged phone calls to Linda White and Therese Olegario on March 9, 2012, and March 12, 2012, the District Court properly found that Lisa Fezard had not engaged in protected activity sufficient to trigger the protection of the anti-retaliation provision of the FLSA. Lisa Fezard disagreed and cited *Kasten v. Saint-Gobain Performance Plastics Corp.,* claiming that oral complaints to an employer invoked the protection of the FLSA. 131 S. Ct. 1325, 1336 (2011). However, Lisa Fezard failed to recognize that, while *Kasten* held that oral complaints were adequate, the Supreme Court expressly refrained from ruling that complaints to a private employer were sufficient. *Id.* at 1334, 1336. This Court, too, has refrained from holding that informal complaints to an employer are sufficient to trigger the FLSA's anti-

40

retaliation provision. *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 716 (8th Cir. 2011).

Prior to *Kasten*, the Second Circuit Court of Appeals affirmatively held that only complaints made to government authorities are protected under the FLSA. *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2nd Cir. 1993). Following *Kasten*, District Courts in the Second Circuit found the *Kasten* holding did not alter the Second Circuit's rule found in *Lambert*. *See Son v. Reina Bijoux, Inc.*, 823 F.Supp.2d 238, 244 (S.D.N.Y. 2011); *Liang v. Café Spice SB, Inc.*, 911 F.Supp.2d 184, 201-02. (E.D.N.Y. 2012)(finding evidence of complaints to plaintiff's employer insufficient).

*Kasten* refrained from holding that complaints to an employer are sufficient to trigger the anti-retaliation provision of the FLSA. The statute's plain language requires a plaintiff to file a complaint, institute a proceeding, testify in any such proceeding, or serve on an industry committee, and Lisa Fezard did none of those things. It was proper for the District Court to find Lisa Fezard's alleged activity was not protected. *See Brown v. L & P Industries,* LLC, No. 5:4CV0379 JLH, 2005 U.S. Dist. LEXIS 39920 (E.D. Ark. Dec. 21, 2005); *Ritchie v. St. Louis Jewish Light*, No. 4:09-CV-1947 CAS, 2010 U.S. Dist. LEXIS 10579, *15-16 (E.D. Mo. Feb. 8, 2010).

41

Just as Lisa Fezard's alleged phone calls to her supervisors did not trigger the FLSA's anti-retaliation provision, neither did the "steam-letting" email Lisa Fezard sent to her employer on March 5, 2012. (App. 1101–1102). First, it was an informal complaint to her employer which is not covered. Even assuming informal complaints to employers trigger the anti-retaliation provision, the March 5, 2012 email amounted to nothing more than insubordination, much like the *Ritchie* case. In *Ritche,* Ritchie stated that Levin, her employer, asked her to perform work without recording overtime. 630 F.3d at 715. When Ritchie continued to record the overtime despite her employer's instructions to the contrary, her employment was terminated for insubordination. *Id.* On appeal, this Court found that recording her overtime "could be nothing more than mere insubordination, she having been instructed to the contrary." *Id.* at 716-17. In the case at bar, the vast majority of Lisa Fezard's caustic email was aimed at assassinating the character of Stang and amounted to insubordination. Additionally, Lisa Fezard sent a dualistic message regarding her pay; she stated: ". . . until the correction is made we will be billing 40 hours + the remainder at OVERTIME, that is what the law states!" (App. 1101)(emphasis in original). However, in the beginning of that very same email, Lisa Fezard also argued for a higher daily rate. (App. 1100-1102). She admitted that she "agreed $200.97 was a 'fair' daily rate of pay . . ." (App. 1100). Lisa Fezard cannot have it both ways, e.g. demand a higher daily rate pursuant to the

42

companionship exemption and simultaneously complain that she was entitled to overtime. By doing both in the same writing, it renders the email notice of nothing. Even assuming intra-company complaints constitute protected activity, Lisa Fezards' March 5, 2012 email was pure insubordination – not notice of a complaint under the FLSA.

### 2. Lisa Fezard Did Not Contact DOL Until After Her Termination

Lisa Fezard was notified of her termination on March 15, 2012, although it is undisputed that Rader made the decision to terminate Lisa Fezard on March 5, 2012, and sent an email to Lisa Fezard on March 8, 2012, requesting a meeting. (App. 1103,1065,1123). Lisa Fezard claimed she called the DOL on March 11, 2012, regarding the lack of overtime pay, although she did not distinguish whether she contacted the federal or state level DOL in her deposition. (App. 1118–1119). Either way, the District Court noted that all of the documentary evidence in the record contradicted Lisa Fezard's false timeline. The WHISARD Complaint Information Form[6] proved that Lisa Fezard first contacted the federal DOL on "05/31/2012" at "1234 hours" for "Failure to pay proper overtime." (App. 2169–

---

[6] Lisa Fezard wrongfully withheld the WHISARD form from UCP during discovery.

2170).  Lisa Fezard's own statement to the NLRB[7] proved she contacted the Arkansas DOL on April 3, 2012.  (App. 2180).

When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  This is especially true when the judge is also the trier of fact.  *See Nunez, supra.*  Also, in the instant matter, it was not that two parties told different stories; it was that Lisa Fezard's testimony failed to match her own records and written statement.  "While it is admittedly not the duty of district courts to weigh the credibility of the parties' testimony at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on her own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether . . . there are any genuine issues of material fact, without making some assessment of the plaintiff's account."  *Pina v. Children's Place*, 740 F.3d 785, 799 (1st Cir. 2014).  "Similarly, the Supreme Court has explained that 'discredited testimony' cannot be relied upon to resist summary judgment.  Thus, to the extent Plaintiff relies upon his own self-serving allegations, the Court properly considers whether a 'reasonable juror would undertake the suspension of disbelief necessary

---

[7] Lisa Fezard wrongfully withheld her statement to the NLRB from UCP during discovery.

Appellate Case: 14-3601    Page: 53    Date Filed: 01/30/2015 Entry ID: 4239642

to credit the allegations.'" *Williams v. Rich*, 2006 U.S. Dist. LEXIS 65251, 12-13 (S.D. Ga. July 24, 2006)(internal citations omitted).

In the instant case, Lisa Fezard's only "proof" that she contacted the DOL prior to her termination on March 15, 2012, was her own false, self-serving testimony belied by the very documentary evidence she produced to UCP after the discovery deadline. The District Court correctly noted Lisa Fezard's evidentiary failure(s). (Add. 028).

Regardless of the undisputed fact that Lisa Fezard could not prove her *prima facie* case of retaliation, UCP presented proof of several legitimate, non-discriminatory reasons for her termination, and Lisa Fezard could not present evidence of pretext, because there was none.

### 3. Legitimate, Non-Discriminatory Reasons for Termination - No Pretext

On November 29, 2011, Lisa Fezard wrote an unprofessional email to her superiors at UCP in which she called them "evil" and made other disparaging remarks and asked accusatory, rhetorical questions. (App. 1094–1095). In December of 2011, UCP held a meeting to discuss the email, but Lisa Fezard hijacked the meeting and only talked about CM's plan of care. (App. 1041–1044). Lisa Fezard yelled at Stang at that meeting and taunted him to "fire" her. (App.

45

1041).  Rader cautioned Lisa Fezard not to write emails of that nature again.  (App. 1047–1049; 1062–1068)

After the December meeting, Stang accompanied Fred Fezard to a meeting with DDS in order to have CM's plan of care increased to pay Lisa Fezard $160 per day to take care of CM during the week.  (App. 1043–1045).  The plan was approved, and it required one-on-one supervision of CM and/or monitoring with a Personal Emergency Response System ("PERS").  (App. 1090–1091; 1065).

The next day, following approval of the plan of care for CM, DDS visited the Fezards' property and found CM unsupervised in his cabin.  (App. 1053–1055).  DDS documented that Lisa Fezard was not with CM, they had no idea how long CM was left unattended, CM was not wearing pants, and it appeared to DDS that Lisa Fezard was not actively working on any goals and objectives relative to CM's newly approved plan of care.  (App. 1053–1055).  The DDS investigator, Patricia White, was "concerned" with the findings.  (App. 1055).

Knowing the DDS visit went poorly, Lisa Fezard wrote another unprofessional email to her superiors on March 5, 2012.  (App. 1058–1060).  Lisa Fezard later admitted the March 5 email, which was sent before she ever claimed to have contacted the DOL or threatened to call the DOL, was what "ultimately ended [her] employment" with UCP.  (App. 1120).

Appellate Case: 14-3601     Page: 55     Date Filed: 01/30/2015 Entry ID: 4239642

As a result of the inspection, the Director of DDS, Carol Cromer, informed Stang that she "deeply question[ed] the excellent care" that Lisa Fezard claimed to give to CM. (App. 1057). Although Stang had not seen a copy of the report by March 5, 2012, he was aware of it. (App. 1061). Cromer's opinion was important to UCP as UCP reports to DDS in serving disabled clients. At that time, on March 5, 2012, Stang let Cromer know that Lisa Fezard's termination was forthcoming. (App. 1057–1058).

In conclusion, Lisa Fezard sent an unprofessional and insubordinate email on November 29, 2011; lobbied for and obtained a higher plan of care for CM; promptly violated that care plan as noted by the DDS inspection; then sent another unprofessional and insubordinate email on March 5, 2012, in which she flatly refused to work for the amount of money in CM's newly established plan of care. (App. 1029–1030; 1053–1060).

As such, there is no dispute UCP had legitimate, justified and non-discriminatory reasons for terminating Lisa Fezard. Lisa Fezard did not produce any proof that those reasons were a pretext for retaliation, and in fact, Lisa Fezard did not even mention the unfavorable DDS report in her brief.[8]

---

[8] The only passing reference to pretext was Lisa Fezard's hearsay document from an unknown author that Lisa Fezard wrongfully withheld in discovery. (Appellant's Brief, 50). For the reasons outlined in UCP's Reply in the underlying case, the District Court properly discounted the tardy, unfounded hearsay document. (App. 2165–2166).

Appellate Case: 14-3601    Page: 56    Date Filed: 01/30/2015 Entry ID: 4239642

## III. Whether the District Court Abused Its Discretion by Sanctioning Appellants for Discovery Violations

Appellants' brief overlooks most of the discovery violations. Due to the volume of the record, it is necessary for UCP to summarize the procedural history and most significant discovery violations.

First, Appellants issued evasive initial disclosures that failed to provide a computation of damages, as required by Fed.R.Civ.P. 26(a)(1)(A)(iii). (App. 2221). The damages disclosures were not supplemented until after business hours on the day of the discovery cutoff (April 25, 2014) and just one day after Ellis' deposition. (App. 716, 821). UCP inquired about damages throughout the depositions, but Appellants denied knowing what their damages were or even how they would be calculated. (App. 719; 726, 729; 739; 744; 760–761; 766). From a review of the supplemental disclosures provided on April 25, 2014, it is apparent that Appellants had the damages calculations in hand for a significant time prior to its disclosure. UCP was denied the opportunity to cross examine each Appellant on their respective damages calculations produced at the discovery cutoff.

Nothing prohibited Appellants from providing a base calculation in their initial disclosures rather than withholding the information until the last possible moment in order to gain a tactical advantage. The only viable conclusion is that

48

the Appellants "hid the ball" so as to prohibit UCP from asking probative questions concerning the damages calculations.

Appellants continued to resist discovery as the case progressed and at every turn. Appellants began by resisting UCP's attempt to schedule the depositions of each plaintiff even though Appellants knew it was UCP's burden of proving the application of the companionship exemption to each Appellant (an inquiry that is fact intensive), and Appellants resisted UCP's attempts to gather relevant facts throughout the remainder of discovery. (UCP APP 201, 212, 215, 227, 263, 279, 338, 355, 410, 411, 442, 575, 586). The District Court ultimately ruled the depositions of the Appellants could go forward, but the delay created by Appellants' resistance cost UCP time and resources. (UCP APP 410, 411, 442, 575, 586).

Written discovery began with each Appellant providing inadequate responses ultimately requiring UCP to file a Motion to Compel. (UCP APP 227–278). The history of the objections and inadequate discovery responses are discussed in the Brief in Support of Motion to Compel. (App. 37). In a text entry, the District Court ruled "All of Appellants' objections are overruled. Appellants are directed to produce the requested discovery by March 31, 2014." (App. 75).

Some material was provided by March 31, 2014, but it became apparent during Appellants' depositions that only partial responses were provided. This

49

resulted in UCP taking blind depositions when UCP should otherwise have had responsive information in hand before the depositions.[9] For example, in some instances, material had been given to Appellants' counsel but never turned over to UCP (App. 717–718; 742), and in others, material was given to Appellants' counsel but not turned over until the day of deposition (App. 727–728; 748; 750–751). Essary claimed to have provided detailed notes of her care for CM – beyond those in her time sheets and progress notes – to her attorneys "in the beginning" of this lawsuit. (App. 741–742). Counsel admitted on the record that they did "have some things from her [Essary] that just didn't – were buried in a file, and we'll get those to you." (App. 745). Appellants never provided the promised documents.

In most instances, Appellants provided no banking information or only a limited amount.[10] In other instances, UCP learned of overlapping employers for the Appellants during depositions.[11] The employer information certainly should

---

[9] These examples are summarized in greater detail in the Brief in Support of Motion for Sanctions and Reply Brief in Support of Motion for Sanctions. (App. 1004, 2183).

[10] Adams and Essary produced no bank records. Bennett produced only one bank statement, which showed significant income over and above her UCP pay. Ellis produced only a limited number of bank statements from Centennial Bank and none from Arkansas Federal Credit Union; she also failed to produce any statements from a second operating account she held at Centennial, which was obtained after her deposition. Winston produced a limited number of incomplete statements from two banks, and parts of those statements were redacted. (App. 735–738).

[11] Adams identified prior work for several other companies for the first time in his deposition. (App. 723–725). Winston identified only UCP as her employer from

50

have been provided at the outset; it was not a difficult interrogatory to understand or answer. Most Appellants never provided the required authorizations, and no Appellant provided a complete set by the District Court's deadline. The timeline of the dates when the few authorizations were produced is included, in bullet point fashion, in the Brief in Support of Motion for Sanctions. (App. 1009–1011). In response to this glaring omission, Appellants argued to the District Court that UCP was not harmed by the discovery violations because UCP was able to obtain some information via subpoena, albeit over the Appellants' objections. (UCP App. 201, 279, 338, 410, 442, 586). However, Appellants' arguments ignore the added expense, lost time, and lost opportunities to cross examine Appellants concerning the documents that were not timely produced or never produced. There is no viable excuse for Appellants' failure to comply with the District Court's Order especially since there should have been no real obstacle to producing authorizations or documents already in their possession.

One of the most harmful violations of the Court's Order was Appellants' wholesale failure to produce over 500 pages worth of documents stemming from the DOL investigation, which included almost fifty pages of statements made by

2001 to present in her discovery responses, but at her deposition, she identified other employers that overlapped with UCP. (App. 731–734). As a result, UCP was unable to obtain Winston's employment records and question her about those records at her deposition. The Hornbacks, Joiner, and Essary failed to disclose other employment in their discovery responses; those employers were not identified until their depositions. (App. 745–746, 748, 750–751).

the Fezards. Appellants' lawyers requested documents from the DOL on April 10, 2013...the day after this lawsuit was filed.[12] (App. 876). The DOL documents were not produced until May 7, 2014, which was after the discovery cutoff. (App. 909). UCP specifically questioned Lisa Fezard during her deposition about written statements she may have provided to the DOL. She claimed that she did not remember ever making or signing any statements and did not know whether she had copies of those statements. (App. 768–769). Her attorneys had already obtained her statements, having requested them almost a year prior to her deposition. UCP learned of the documents existence only after Appellants used one of the withheld DOL documents at the deposition of Stang on May 1, 2014. (App. 772–774).[13] Once the documents were finally received, UCP discovered critical evidence including emails between Lisa Fezard and DOL investigators. At least one of those emails discussed living arrangements for two of UCP's clients and Lisa Fezard's claims that she was paid $10.00 an hour to take care of those UCP clients...an amount that is vastly different than the amounts claimed by Appellants in damages calculations produced at the discovery cutoff. (App. 911, 821–870). Furthermore, the content of emails regarding pay proves that

---

[12]   The DOL refused to provide UCP with the statements given by the Fezards. (App. 903).

[13]   UCP agreed to produce Stang for deposition after the discovery cutoff.

Appellate Case: 14-3601     Page: 61     Date Filed: 01/30/2015 Entry ID: 4239642

Appellants had the ability to provide damages calculations at the outset of this case rather than at the conclusion of discovery!

These documents not only impact the class wage and hour allegations and companionship exemption, they also impact Lisa Fezard's retaliation claim. In the same, never-before-disclosed email to the DOL investigator, Lisa Fezard admitted she was terminated <u>because of</u> the insubordinate email she sent to Stang and others on March 5, 2012. (App. 911). That admission flies in the face of her subsequent claim she was terminated for filing a complaint with the DOL. Appellants effectively eliminated UCP's ability to cross examine Lisa Fezard with the document during her deposition.

The most significant DOL document withheld by Appellants was a twenty-five page timeline of events prepared by Lisa Fezard. The "manifesto" includes conversations with other UCP employees, conversations with other class members (Essary), alleged admissions on the part of UCP managers, claims about monthly expenses at the cabins rented by UCP clients, conversations with a UCP client's trustee, asserted facts regarding the money missing from a UCP client's belongings while in the Fezards' possession, and a detailed listing of activities Lisa Fezard claimed to have accomplished with a UCP client. (App. 878–902). This information was exactly the type of information requested in Interrogatory No. 9 and ordered to be produced by the District Court.

Appellate Case: 14-3601     Page: 62     Date Filed: 01/30/2015 Entry ID: 4239642

Appellants blamed the delay in production of the DOL records on "a clerical error" in the cover letter to a document production on February 14, 2014. (App. 910). However, after Lisa Fezard's deposition, counsel for UCP wrote a follow-up request for additional documents, including any emails between Lisa Fezard and DOL investigators. (App. 798). The response provided almost three weeks later was, "Lisa has looked and did not find any." (App. 815). The only real conclusion that can be drawn is that no one looked to see if the DOL documents had in fact been produced, despite the existence of a very blunt court order requiring the document production. Anyone performing a good-faith search for the notable DOL documents would have found and produced them under the circumstances. The missing DOL records contain key evidence in this case, and the production of the missing DOL records should have happened shortly after the discovery was propounded to Appellants, prior to the deadline in the Court's order, prior to the request for supplementation of DOL documents, and certainly prior to discovery cutoff. The failure to provide this discovery was in direct violation of the Court's order and was worthy of the most extreme sanction.

UCP's right to meaningfully cross examine Appellants was blocked due to their failure to produce damages calculations until the discovery cutoff and failure to produce documents that Appellants submitted to the DOL. In addition, records obtained with belated authorizations and subpoenas issued after the discovery

Appellate Case: 14-3601    Page: 63    Date Filed: 01/30/2015 Entry ID: 4239642

cutoff revealed that additional relevant information was not provided. For example, UCP was prevented from obtaining relevant financial information that would have been addressed in the Appellants' depositions. Several of the instances described in the briefs submitted to the District Court demonstrate that multiple Appellants claimed they were entitled to pay from UCP while they were working for other entities. UCP was deprived of the opportunity to conduct relevant discovery concerning the work practices of Appellants and alternate sources of income, which support the notion that Appellants were not truly working for UCP as claimed. (App. 1004, 2183).

The cumulative effect of all of Appellants' violations evidences willful indifference to their discovery obligations. Discovery in this case was like a game of hide-and-seek rather than the forthright discovery contemplated by the Rules, especially in a case where Appellants seek millions of dollars from a non-profit organization.

Of all the discovery violations, the District Court was most troubled by Appellants' failure to produce damages calculations pursuant to Fed.R.Civ.P. 26(a)(1)(A)(iii). The District Court held the sanction is mandatory "unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." (Add. 002). The District Court observed that Appellants failed to provide per-hour wage-rates until the close of discovery and that per-hour wage

rates would have enabled UCP to make a rough calculation of damages for use in Appellants' depositions. The District Court further noted that Appellants argued it was not their duty or too difficult to provide an hourly wage-rate, yet Appellants produced a detailed spreadsheet on the discovery cutoff which included an hourly rate. The District Court tracked through Appellants' discovery violations and concluded generally that "Plaintiffs did not provide all of the discovery which the Court ordered them to provide." (Add. 004). The District Court also disagreed with Appellants' assertion they did not have to respond to discovery propounded on April 7, 2014 (almost three weeks prior to the discovery cutoff). The District Court held that "this is one of the rare instances where sanctions are warranted. Defendant was prejudiced throughout the discovery process by Plaintiffs' failure to timely produce, if at all, a significant amount of discovery. Plaintiffs have not provided the Court with substantial justification for their failures to produce and supplement, particularly with regard to damages. Therefore, the Plaintiffs are prohibited from presenting evidence of monetary damages resulting from their claims." (Add. 005).

Appellants now contend the District Court abused its discretion on three grounds. There was no abuse of discretion, and the sanction should be affirmed.

A.     **Whether Appellants Produced Required Evidence of Damages Prior to Close of Discovery.**

Appellants contend they were not obligated to produce "exact calculations of their damages at all" and that it was an abuse of discretion for the District Court to sanction Appellants for producing the calculations on the discovery cutoff. It is undisputed that Appellants failed to provide any damages calculations until the discovery cutoff. Citing a U.S. Supreme Court case from 1946, Appellants contend they had a reduced burden on damages and were relieved of the obligation to provide damages calculations because the employer has the duty to keep proper records of wages and hours. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).

The *Mt. Clemons* argument is inapposite to the case at hand, because the case does not address the 1993 amendments requiring initial disclosure of damages calculations. Nothing in *Mt. Clemons* supports Appellants' position they are relieved of the obligation to provide damages calculations as defined in Rule 26(a)(1)(A)(iii). Rather, *Mt. Clemons* addresses situations where the employee is prohibited from defining his damages due to the employer's failure to maintain accurate records. Here, Appellants had the ability to calculate damages and in fact did so, albeit belatedly and on an inflated scale. (App. 821–870). Furthermore, Appellants possessed the DOL's damages calculations, which could have also been used to satisfy the requirements of Rule 26(a)(1)(A)(iii). (App. 2196–2197, 2219).

Appellate Case: 14-3601     Page: 66     Date Filed: 01/30/2015 Entry ID: 4239642

Appellants cannot genuinely argue that they lacked the ability to comply with the Rule.

Rule 26(a)(1)(A)(iii) is specific and requires—unless exempt by the rule, by stipulation of the parties, or ordered by the Court—"a party must, without awaiting a discovery request, provide to the other parties … a computation of each category of damages claimed by the disclosing party…." Fed.R.Civ.P. 26(a)(1)(A)(iii). A wage and hour action is not on the list of those matters exempt from the initial disclosure requirement. Fed.R.Civ.P. 26(a)(1)(B). Appellants did not ask the District Court to modify the initial disclosure obligation, except for the deadline to produce initial disclosures, in the parties Joint Rule 26 Report. (UCP APP 185). Rule 37(c) provides for the exclusion of evidence not properly disclosed, unless there was a substantial justification for the failure to disclose, or the failure was harmless. Fed.R.Civ.P. 37(c). The Advisory Committee Notes for the 1993 Amendments to Rule 37(c) explain the sanction is "self executing," and no motion is needed when a party fails to make a disclosure required by Fed.R.Civ.P. 26(a). The Notes further illustrate the automatic sanction is intended to induce the disclosure of evidence early.

Appellants state they "had no obligation to produce [the damages calculation] at all." (Appellants' Brief, 56). However, if Appellants believed they were not bound by the requirements of Rule 26(a)(1)(A)(iii), they should have

Appellate Case: 14-3601   Page: 67   Date Filed: 01/30/2015 Entry ID: 4239642

asked the District Court to modify the initial disclosure requirement at the outset, rather than hide behind the log until discovery was over before producing their damages calculations. Appellants proceeded at their own peril when choosing not to abide by the requirements of Fed.R.Civ.P. 26(a)(1)(A)(iii). The District Court was well within its rights, and did not abuse its discretion, when choosing to prevent Appellants from presenting evidence of monetary damages at trial due to the discovery violation.

Appellants next contend the District Court abused its discretion because the damages calculations were in fact produced before the expiration of discovery. The damages disclosure was provided after business hours at 5:23 pm on Friday, April 25, 2014—the last day of discovery. (App. 821). As a practical matter, discovery was over, and nothing else could be done before midnight on April 25th. A disclosure of damages calculations should have occurred on September 18, 2013, the date set by agreement in the Rule 26 report. (UCP APP 185–86). The eleventh-hour disclosure violated the letter and spirit of the discovery rules, thereby warranting sanctions. *ELCA Enterprises, Inc. v. Sisco Equip. Rental & Sales, Inc.,* 53 F.3d 186 (8th Cir. 1995)(affirming exclusion of damages evidence provided after trial court's deadline for submitting the evidence but before the discovery cutoff); *See also Laclede Gas Co. v. G.W. Warneckie Corp.,* 604 F.2d 561, 565 (8th Cir. 1979).

The remedy selected by the District Court was consistent with the practice of other courts when faced with the same or similar problem. *Dynegy Marketing and Trade v. Multiut Corp.,* 648 F.3d 506, 514 (7th Cir. 2011)(excluding undisclosed damages declaration); *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.,* 596 F.3d 357, 367–69 (6th Cir. 2010)(excluding damage claims as sanction for failing to provide basis for damages either in the initial disclosures or in response to later discovery requests); *CQ, Inc. v. TXU Min. Co., L.P.,* 565 F.3d 268, 279–280 (5th Cir. 2009)(excluding undisclosed damages calculations); *Agence France Presse v. Morel,* 293 F.R.D. 682 (S.D.N.Y. 2013)(broader range of damages precluded for failing to disclose damages calculations); *Olaya v. Wal-Mart Stores, Inc.,* 2012 U.S. Dist. LEXIS 111079 (D. Nev. 2012); *Gould Paper Corp. v. Madisen Corp.,* 614 F.Supp.2d 485 (S.D.N.Y. 2009)(prohibiting party from proving damages due to failure to provide damages calculations prior to discovery cutoff).

Perhaps the most telling case is *Hoffman v. Construction Protective Services, Inc.,* 541 F.3d 1175, 1179 (9th Cir. 2008). In *Hoffman*, the Ninth Circuit affirmed the District Court's exclusion of damages as a sanction for failing to provide timely computations. Like the case at hand, Appellants in *Hoffman* brought a wage and hour action under state law and the FLSA.

Appellate Case: 14-3601    Page: 69    Date Filed: 01/30/2015 Entry ID: 4239642

Appellants cite no law to illustrate the District Court's decision was erroneous. If Appellants' argument were to be adopted by the Eighth Circuit, the precedent from this case going forward would encourage litigants to sandbag and withhold information rather than produce the information in a timely manner; such an interpretation is contrary to the letter and spirit of the discovery rules.

Because Appellants had the ability to calculate their damages, there was no substantial justification for the omission of the damages calculation disclosure. Furthermore, the violation cannot be categorized as harmless. Appellants gained a distinct tactical advantage by withholding the damages calculations because UCP was deprived of the opportunity to cross-examine each Appellant concerning their damages theory, which no doubt would have garnered admissions to be used in a motion for summary judgment or at trial.[14] There was no abuse of discretion. The District Court's ruling was consistent with other courts that have evaluated the issue.

**B. Whether Appellants' Discovery Violations Met the Legal Requirements for the Sanction Imposed**

---

[14] In their calculations, Appellants divide the day rate as if it were intended to cover only eight hours of work even though most companionship plans cover more than eight hours in a given day. This issue alone results in a grossly skewed calculation which, if given the opportunity, would have been thoroughly discussed with each Appellant using their individual day rates and plans.

Appellate Case: 14-3601    Page: 70    Date Filed: 01/30/2015 Entry ID: 4239642

Because the District Court's "automatic" sanction was justified via Fed.R.Civ.P. 26(a) and 37(c), the inquiry into the sanction chosen by the District Court need not go further. Nevertheless, the District Court's judgment was sound even if the sanction stemmed from the violations of the District Court's discovery order pursuant to Fed.R.Civ.P. 37(b). The District Court has the power to issue a myriad of sanctions for discovery violations, up to and including dismissal. *Edgar v. Slaughter*, 548 F.2d 770, 772 (8th Cir. 1977); *Schoffstall v. United States Postal Service*, 223 F.3d 818, 823 (8th Cir. 2000); *Keefer v. Provident Life and Accident Ins. Co.,* 238 F.3d 937, 941 (8th Cir. 2000). The Court may find willful disobedience sufficient to support a dismissal when a party employs stall tactics and disregards Court Orders. *In Re: Dennis J. O'Brien*, 351 F.3d 832, 836 (8th Cir. 2003). If the facts demonstrate both willful conduct and bad faith, "the district court is not required to investigate the propriety of a lesser extreme sanction." *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818 (8th Cir. 2001). "A finding of prejudice under 37(b) is proper if the failure to make discovery impairs an opponent's ability to determine the factual merits of a party's claim." *O'Brien, supra*, at 839. In addition to Rule 37(b), the District Court has inherent power to issue discovery sanctions. *Stevenson v. Union Pacific Railroad Co.,* 354 F.3d 739 (8th Cir. 2004). When evaluating a discovery sanction, the Appellate Court "will reverse only if the District Court's ruling was based on an erroneous view of the

law or a clearly erroneous assessment of the evidence and affirmance will result in fundamental unfairness." *Wegener v. Johnson,* 527 F.3d 687, 690 (8th Cir. 2008) (internal quotations and citations omitted).

In this section of Appellants' Brief, they first appear to make an argument of "substantial compliance." Appellants contend they were only given seven days to comply with the Court's Order, and they "made their best effort to comply." (Appellants' Brief, 57). Hence, Appellants contend there was no willful violation of the Court's discovery Order. In support of this argument, Appellants point to an email from their counsel in which she indicated she would get "most everything" by the deadline ordered by the District Court and indicated that Appellants would "work to get you everything ASAP of we don't have it [by the deadline.]" (App. 819). Naturally, UCP assumed Appellants would comply with the order soon after the order was entered. The history and pattern of discovery violations, summarized above, proves UCP was incorrect in its assumption. There were multiple instances of Appellants failing to timely provide the information they were obligated to provide—even though Appellants possessed the documents (as was the case with the Fezards, Essary, Ellis, K. Hornback, W. Hornback, and Adams)—followed by Appellants' opposition to subpoenas issued in an attempt to cure Appellants' discovery violations. (App. 1008–1010; UCP APP 201, 338, 410, 442, 586). The only logical conclusion that can be drawn is that Appellants

willfully violated the District Court's order, or they were willfully indifferent to their discovery obligations. In fact, UCP challenges Appellants in their Reply Brief to identify even one Appellant who actually complied with the District Court's order in its entirety and not just "substantial compliance." Some came closer than others, but there is not one single Appellant who did what the District Court instructed him or her to do.

The bulk of Appellants' brief in this section is devoted to arguing that some of the violations were harmless. In one example, Appellants contend their failure to provide Ellis' authorizations was harmless where some employment records were obtained via subpoena. Appellants ignore that subpoenas were issued because authorizations were not timely provided which resulted in UCP getting the information after depositions were completed, and in some cases after the discovery cutoff, as was the case with the Arkansas Federal Credit Union records on Ellis. Ellis' banking records indicated spending patterns on activities that were inconsistent with the activities claimed in her timesheets, and UCP was deprived of the opportunity to ask Ellis about the discrepancies. (App. 1018). Next, Appellants claim there was no harm stemming from Joiner's failure to provide employment or bank authorizations because Joiner produced bank statements. Joiner produced incomplete bank records; if she had signed the authorization, UCP could have obtained a complete copy of her banking records, including cancelled

checks and deposit slips. The cancelled checks and deposit slips help identify where else Joiner may have been working and who she would have been paying to watch the UCP client during times when Joiner left the client with others while Joiner was supposed to be working…e.g., Karen Hornback's banking records obtained via subpoena after the discovery cutoff showed Karen Hornback was paying Amanda Joiner, presumably to take care of the UCP client with whom Hornback lived. (App. 2183, 2198–2199). Furthermore, if all of Joiner's bank records were provided, why not just sign the authorization so that UCP could verify the veracity of the documents produced? The clear implication is that Joiner, like the others, did not want UCP having access to the banking records despite the District Court's order.

Next, Appellants contend the District Court erred when it concluded that Jones did not produce any tax or employment records. Appellants argue Jones "produced tax returns and could not have produced employment records because she had no employer other than UCP during the time at issue." (Appellants' Brief, 58). First, it does not appear Appellants included Jones' document production in the record to prove the District Court erred. Furthermore, Jones admitted she did not produce tax returns for the years 2009, 2011, and 2012 even though she filed tax returns for those years. (App. 753). Furthermore, Jones readily admitted in her discovery responses that she worked for other employers during the applicable

statute of limitations. (App. 1813). Hence, Appellants' justification for failing to produce employment information, including an authorization, is erroneous.

Next, Appellants contend there was no harm from Adams' failure to produce a tax authorization because he produced tax records. However, Appellants overlook the fact the tax information was incomplete, with no tax returns for the years 2010 and 2013, and the information that was eventually produced <u>was withheld</u> until the day of Adams' deposition on April 10, 2014. (App. 722, 727–728; 1826–1829). Certainly, UCP was harmed because it was denied the opportunity to inquire about income and wages that would have been earned while working for others during periods when Appellants were supposed to be working for UCP. UCP was also deprived of the opportunity to determine whether Adams claimed his live-in UCP client as a dependent for the missing tax returns…a fact that helps illustrate whether the UCP client "lived" at the same residence as the employee for purposes of applying the companionship exemption.

Appellants contend the District Court was erroneous when it wrote, "according to the Defendant's pleadings, Lisa Fezard, Fred Fezard, Helen Buckley, and Deloma Bennett did not provide any of the documents." (Appellants' Brief, 59). However, Appellants misconstrue the District Court's ruling because Appellants fail to take note of the sentences preceding and following the quoted language. When read in context, the District Court was clearly referring to the

66

listed Appellants' wholesale failure to provide the authorizations. (Add. 004). It is evident the District Court was discussing UCP's bullet point summary of the authorizations that were never produced by the Fezards, Bennett, and Buckley. (App. at 1009–1010).

There is no reasonable explanation for Appellants' failure to supply the authorizations as ordered, yet all failed to provide a complete and timely set of authorizations. How could Appellants' refusal to sign authorizations be anything other than willful? If the Appellants did not understand what the District Court intended, they should have sought clarification. There are numerous instances of Appellants' failure to outright comply with the Order and other instances of partial compliance. The willfulness of these violations was brought into focus by Appellants' eleventh hour revelation of damages calculations coupled with their intent to use the discovery cutoff as a shield to relieve Appellants from having to provide complete answers to discovery as ordered by the District Court.[15]

Appellants contend there is insufficient evidence of "willfulness." However, Appellants demonstrated a pattern of withholding information, refusing to provide authorizations, and objecting to subpoenas that were intended to cure the Appellants' discovery violations. Their conduct viewed individually and as a

---

[15] Recall that Appellants refused to answer discovery issued approximately fifteen days before the discovery cutoff and moved to quash subpoenas issued after the discovery cutoff. (App. 871, 874; UCP APP 442, 575, 586).

Appellate Case: 14-3601    Page: 76    Date Filed: 01/30/2015 Entry ID: 4239642

whole, can only be considered willful. The harm to UCP is clear and was explained in its Brief in Support of Sanctions and Reply Brief in Support of Sanctions. (App. 1004, 2157). Appellants' multiple discovery violations prevented UCP from asking probative questions on a number of topics during Appellants' depositions. In addition, UCP's strategic questions were asked without Appellants complying with their discovery obligations.

On page sixty of Appellants' brief, they argue the order granting the sanction was a moot issue because the District Court filed an order soon thereafter granting UCP's Motion for Summary Judgment. Appellants' argument might have merit if the summary judgment motion was decided first, but as a matter of law, it was not. Furthermore, the sanction issue only becomes moot if summary judgment is affirmed on appeal.

Appellants argue UCP is at fault for not taking steps to cure Appellants' discovery violations by filing yet another motion to compel, petitioning to extend discovery and continue trial, and re-depose Appellants. This argument ignores (1) the prejudice already sustained by UCP, who was forced to ask strategic questions during the depositions without the benefit of full discovery; (2) the financial burden the continued discovery battle will create; and (3) Appellants' open resistance to discovery after the cutoff. (App. 871, 874; UCP APP 442, 575, 586).

68

Finally, Appellants make the unsupported argument that the imposition of sanctions was tantamount to dismissal of Appellants' case. Not so. In theory, the case could proceed without recovering individual damages because Appellants sued for declaratory judgment, which would provide prospective relief to the named plaintiffs and class members who remain employed with UCP, if UCP's interpretation of the companionship exemption is somehow incorrect. Furthermore, Appellants sued UCP for civil penalties under the AMWA, a claim which, in theory, remains unaffected by the District Court's sanction. (UCP APP 1, 285). Ark. Code Ann. §§11-4-206, 218 (2013).

The spirit of the rules governing initial disclosures and written discovery supports the notion that known information should be produced in a timely fashion and in compliance with Court orders. If Appellants' interpretation of the rule were adopted, it would encourage litigations to withhold damages information until the eleventh hour and provide only the most limited information until the discovery cutoff.

The District Court did not abuse its discretion; the issuance of Sanctions should be affirmed.

**C. Whether the District Court Abused its Discretion in Choosing the Sanction imposed.**

Appellate Case: 14-3601    Page: 78    Date Filed: 01/30/2015 Entry ID: 4239642

The Court of Appeals need not address this issue in light of the automatic sanction imposed via Fed.R.Civ.P. 37(c).

In the event the sanction is evaluated under the standards of Fed.R.Civ.P. 37(b), there was no abuse of discretion because the District Court chose a remedy that was sufficiently related to the violations (failure to produce damages calculations, resistance to Court's order to produce authorizations, financial information, and other records that would be used to evaluate damages). As noted in the order imposing the sanction, the District Court thoroughly reviewed all pleadings and exhibits filed by the parties. (Add. 003). The District Court rejected the sanctions recommended by Appellants as well as the primary sanction sought by UCP.

Appellants complain the District Court should have provided a narrower sanction that would have permitted Appellants to recover their damages. This argument, if adopted, would have the literal effect of allowing Appellants to profit from their discovery violations. UCP remains convinced the District Court would not have abused its discretion if it had dismissed the lawsuit outright for discovery violations, but instead chose a lesser sanction. The lesser sanctions suggested by Appellants include (1) imposition of costs and attorneys fees; (2) exclusion of documents not produced by the discovery cutoff; and (3) re-opening discovery to allow UCP to re-depose Appellants at Appellants' expense.

Appellate Case: 14-3601    Page: 79    Date Filed: 01/30/2015 Entry ID: 4239642

The parties briefed the potential imposition of costs and attorneys' fees, and both sides recognized Appellants' inability to repay UCP. (App. 1778). Hence, the imposition of such a sanction would be futile, and Appellants have not done anything to prove the contrary is true. Though not addressed in detail below, the exclusion of documents produced after the discovery cutoff would harm UCP and not Appellants because those documents demonstrate the application of the companionship exemption, reduce damages, and/or provide impeachment material. Appellants' proposed remedy would "sanction" only UCP. Finally, re-opening discovery does not cure the defects because the "bell has been rung" with respect to strategy decisions that were revealed in depositions. Moreover, there is no way to logistically ensure that Appellants reimburse UCP for re-opened discovery without creating additional harm to UCP. To be specific, if UCP submitted a fee petition for a second round of depositions, Appellants would no doubt challenge the amount of the invoices, ask to see the invoices for the work performed, and gain further insight into UCP's defensive strategies. Re-opening discovery creates an additional strategic and administrative burden and harms UCP. Appellate courts have recognized that re-opening discovery is not without harm to the parties and the court. *See Carmody v. Kansas City Bd. Of Police Comm.,* 713 F.3d 401 (2013)(re-opening discovery and continuing trial would not cure prejudice). *Hoffman, supra* (not harmless error for late disclosure of damages because new

71

briefing schedule likely required with re-opened discovery; "Such modifications to the court's and parties' schedules supports a finding that the failure to disclose was not harmless"). There was no abuse of discretion for the District Court to reject the "remedies" proposed by Appellants.

Unlike the cases cited by Appellants, the District Court clearly weighed the sanctions available and chose the best fit. The sanction was tailored to the unfortunate facts and circumstances of this case. Contrary to Appellants' assertion, the remedy selected by the District Court was not "unprecedented, unjustified, and arbitrarily abusive" because other courts have imposed the same remedy for the same or similar violations. *Hoffman, supra; Dynegy Marketing and Trade, supra; Bessemer & Lake Erie R.R. Co., supra; CQ, Inc., supra; Agence France Pressel, supra; Olaya, supra; Gould Paper Corp., supra*.

## IV.  This Case Should Not be Reassigned If Remanded

In the event the Circuit Court of Appeals decides to reverse and remand this case, there is no basis to send this case to another judge. The District Court assigned to the matter is intimately familiar with the case and has demonstrated neutrality at the hearings and in its rulings. There is no evidence of partiality whatsoever, nor is there evidence the District Court failed to do its job. The case at bar is entirely distinguishable from the one cited by Appellants for the proposition the judge should be removed from the case. *See Sentis Group, Inc. v. Shell Oil*

72

*Company*, 559 F.3d 888 (8th Cir. 2009). It is evident Appellants seek a new judge because the District Court granted summary judgment, and Appellants wish to forum shop. If Appellants' logic is followed and adopted in this case, the precedent hereafter would be cited in an effort to remove any judge in situations where a dispositive motion was granted or where discovery violations were found. From a policy perspective, it is unworkable to remove a judge from a case on such limited grounds. Rather, Appellants should be required to present evidence to support a finding for disqualification under 28 U.S.C. §455. No such showing is made here.

Appellate Case: 14-3601    Page: 82    Date Filed: 01/30/2015 Entry ID: 4239642

## <u>CERTFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance With Type-Volume
Limitation, Typeface Requirements, and
Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 16,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type face style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman, Font Size 14.

3.      I further certify that in accordance with Eighth Circuit Rule 28A(h), the document being filed herein is in searchable PDF format, has been scanned for viruses, and is virus-free.

/s/  S. Brent Wakefield  AR BIN 99144
Attorney for Appellee
Dated: January 30, 2015

Appellate Case: 14-3601    Page: 83    Date Filed: 01/30/2015 Entry ID: 4239642

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


Delena Hurst
delena@sanfordlawfirm.com

Josh Sanford
josh@sanfordlawfirm.com

                                          /s/ S. Brent Wakefield
                                          AR Bar Number 99144
                                           /s/ James D. Robertson
                                          AR Bar Number 95181